S00A1392. MOODY v. THE STATE.
(537 SE2d 666)

HINES, Justice.

Sundiato Moody appeals his conviction for felony murder in connection with the fatal bludgeoning of William Peaks, also known as William Brown. Moody alleges violation of the right of cross-examination, instances of prosecutorial misconduct, and ineffective assistance of trial counsel. Finding the challenges to be without merit, we affirm.[1]

The State's eyewitness Anthony Gay failed to appear at trial. After continuing the trial in order to attempt to secure Gay's presence, and after hearing evidence from investigators, Gay's mother, and Gay's employer that Gay could not be located, the trial court found that Gay was unavailable and allowed the State to introduce his testimony from the preliminary hearing. See OCGA § 24-3-10.[2]

At the preliminary hearing, Gay initially stated that Moody was not the person who beat the victim; however, after a brief recess, he changed his testimony to identify Moody as the assailant. Gay said that he had earlier testified falsely because he felt threatened by unidentified men who were sitting in the courtroom and then were removed. He stated that he did not know who the men were, but he had observed them on Cleveland Avenue on several occasions. Gay further stated that he had not wanted to come forward and testify out of fear for his safety and that of his family. Gay then related what

---

[1] The fatal attack occurred on or about November 28, 1995. On October 8, 1996, a Fulton County grand jury indicted Sundiato Moody for malice murder, felony murder while in the commission of aggravated assault, and aggravated assault. Moody was tried before a jury May 26 through June 1, 1998, and was acquitted of malice murder, but found guilty of felony murder and aggravated assault. On June 1, 1998, he was sentenced to life imprisonment for felony murder; the trial court found the aggravated assault merged for the purpose of sentencing. Moody filed a motion for new trial on June 25, 1998, and the motion was amended on December 16, 1999, January 5, 2000, January 7, 2000, and February 4, 2000. The motion for new trial was denied on February 16, 2000. A notice of appeal to the Court of Appeals was filed on March 8, 2000. The appeal was transferred to the Supreme Court on April 20, 2000, and it was docketed in the Supreme Court on May 5, 2000. The case was submitted for decision on July 3, 2000.

[2] OCGA § 24-3-10 provides:

The testimony of a witness since deceased, disqualified, or inaccessible for any cause which was given under oath on a former trial upon substantially the same issue and between substantially the same parties may be proved by anyone who heard it and who professes to remember the substance of the entire testimony as to the particular matter about which he testifies.

he saw and heard on the night of the beating.[3]

Between 10:00 p.m. and 11:30 p.m. on or about November 28, 1995, Gay was on the front porch of his home on Cleveland Avenue when he heard hitting sounds. He looked across the street and saw a "stick going up, going down in the air." Gay asked his brother-in-law, Arnold, to walk with him to a hill to see what was happening. The two men crossed the street and stood on a sidewalk at the top of a grassy embankment sloping down to a parking lot. Gay and Arnold saw Sundiato Moody beating a man with a stick the size of a baseball bat. Gay had known Moody for a couple of months, from observing Moody walk up and down Cleveland Avenue. Moody was hitting the man with the stick as hard as he could. The man was folded up on the ground, and pleaded with Moody not to hit him anymore. But Moody continued to steadily beat him.

Gay and Arnold walked home, and as they were leaving the scene, they saw two men go over and watch the beating. When Gay got home he told his mother about what was happening and she called 911. As they waited for help to arrive, Gay watched from his window as Moody continued to beat the victim. A small brown car came on the scene, Moody entered the passenger side, and the car drove away. Gay observed that when the ambulance arrived, the beaten man was unable to move.

When the paramedics found the victim lying in the parking lot, he was conscious but unresponsive. They observed lacerations and contusions about the victim's face and head and blood coming from his scalp, and they began aggressive treatment after concluding that the situation might be life-threatening. The victim was transported to a hospital and died there on December 8, 1995. An autopsy revealed bruising around both eyes and on the right shoulder, a tear of the scalp, tears of the skin around the mouth, and fractures of the jaw. The victim's teeth had been knocked out, and he sustained bleeding in the mouth and bleeding around the brain itself. The victim died from delayed consequences of the beating.

1. The evidence was sufficient to allow a rational trier of fact to find Moody guilty beyond a reasonable doubt of felony murder while in the commission of aggravated assault. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Moody contends that the court erred in admitting Gay's testimony in that his counsel was not afforded a thorough and sifting

---

[3] After the victim's death was reported to police, the lead investigator in the case, who knew the victim to be a homeless man called "Bill," interviewed Gay and took his statement. The statement was consistent with Gay's version of events at the preliminary hearing. Gay also identified Moody from a photographic lineup.

cross-examination as contemplated by OCGA § 24-9-64.[4] He argues that is so because the preliminary hearing judge refused to allow him to call to the stand and question the unidentified men who had been in the courtroom and for whom Gay had indicated fear.

But Moody miscasts the court's refusal to bring the unidentified persons into the proceeding as an impermissible infringement of his right to confront Gay. The *statutory right of confrontation gives a party the right to a thorough and sifting cross-examination of witnesses called against him.* OCGA § 24-9-64; *Givens v. State,* 264 Ga. 522, 523 (2) (448 SE2d 687) (1994). Insofar as Moody asserts that questioning the unidentified men would have been relevant to Gay's apparent claim of intimidation, Moody was afforded the opportunity to challenge Gay's credibility through his cross-examination; in fact, defense counsel questioned Gay about the men. When the preliminary hearing testimony of an unavailable witness is subject to extensive cross-examination, as Gay's testimony was in this case, its admission at trial does not abridge the defendant's right of cross-examination. *Hosick v. State,* 262 Ga. 432, 435 (4) (421 SE2d 65) (1992), citing *Littles v. Balkcom,* 245 Ga. 285 (3) (264 SE2d 219) (1980).[5]

3. Moody fails in his contention that the State was guilty of prosecutorial misconduct by arguing in its closing "prejudicial and harmful" facts not in evidence. He quotes four excerpts which, in turn, involved (1) Gay's alleged fear; (2) Gay's certainty that Moody was the assailant; (3) the reason for Gay's initial reluctance at the preliminary hearing to identify Moody as the killer; and (4) sending a message to the community that you cannot "beat the system" by intimidating people about coming to court.[6] But Moody failed to make a

---

[4] OCGA § 24-9-64 provides: "The right of a thorough and sifting cross-examination shall belong to every party as to the witnesses called against him. If several parties to the same case have distinct interests, each may exercise this right."

[5] Although not enumerated as error, in argument Moody suggests that the court was obligated to give a cautionary instruction regarding the "limited purpose" for which Gay's testimony was being admitted. But the testimony was admitted as substantive evidence. Even accepting arguendo some limitation on the testimony, there was no request for any cautionary statements to the jury. In fact, quite the contrary. Moody urged that the jury be told only that the witness was unavailable, and therefore, that the court was allowing the reading of the transcript of the witness's testimony. Moody further mentions that Gay's testimony was somehow burden-shifting because of the question of the alleged intimidation, but Moody did not make this argument below.

[6] The assistant district attorney stated:

We need to send the message that our system can work because to let this guy beat somebody up and just walk out of here, it says more than our system has some problems. It just flat out does not work. It doesn't work because, do you know what, you can get around it. You can threaten people when they come to court. You can make them feel uncomfortable and so that they don't come to court; and, do you know what, you can beat the system that way.

contemporaneous objection in regard to the State's comments contained in the first three excerpts; therefore, the failure to invoke a ruling by the trial court precludes consideration of the merits of his challenge on appeal regarding those comments. *Metts v. State*, 270 Ga. 481, 484 (4) (511 SE2d 508) (1999); *Mullins v. State*, 270 Ga. 450 (2) (511 SE2d 165) (1999). As to the statements about threatening a witness in order to beat the system, the court sustained Moody's objection. However, Moody made no further objection or request for additional relief. Thus, even assuming that the argument was improper, " '[i]t is well settled that a sustained objection to improper argument of counsel cannot serve as the basis for reversal unless it is contemporaneous with a denied motion for mistrial, denied request to strike, or denied request for curative instructions.' " *Kyler v. State*, 270 Ga. 81, 82 (2) (508 SE2d 152) (1998), quoting *Prince v. State*, 257 Ga. 84, 88 (355 SE2d 424) (1987).

4. Moody likewise fails in his claims that the State in closing argument improperly bolstered Gay's credibility and that it was reversible error for the trial court to fail to sustain his objection to such argument.[7] The assistant district attorney's comments about Gay's absence and that it "speaks volumes about his credibility" followed numerous statements by the defense in closing about the jury's difficulty in assessing Gay's credibility because he was not in court.[8] See *Morgan v. State*, 267 Ga. 203 (476 SE2d 747) (1996). What is more, the State's comments did not constitute an opinion about Gay's veracity. *Johnson v. State*, 271 Ga. 375, 384 (15) (b) (519 SE2d 221) (1999). Compare *Bolden v. State*, 272 Ga. 1 (525 SE2d 690) (2000). The comments merely urged the jury to make a deduction about veracity from the facts. *Shirley v. State*, 245 Ga. 616, 617 (1) (266 SE2d 218) (1980).

5. Finally, Moody's claim that trial counsel was ineffective for failing to adequately investigate and present an alibi defense based upon the testimony of his mother and sister is unavailing. In order to prevail on his claim of ineffective assistance of counsel, Moody must show that his attorney's performance was deficient and that the deficiency prejudiced him such that a reasonable probability exists that,

---

[7] Defense counsel objected that the argument was improper but failed to state any reason why.

[8] The assistant district attorney stated:

Once those two individuals were gone out of the courtroom, that's when he was able to tell exactly what happened that night; and do you know what, he is not here today and we have been waiting how many days to hear from him? The last witness that you heard from was Thursday morning, the medical examiner's office; and common sense would tell you that the state has not been sitting back twiddling their thumbs hoping that this guy would just fall out of the ski [sic] and land in the witness seat. He would be here if we could get him here, but he is not; and that speaks volumes. That speaks volumes about his credibility.

but for the attorney's errors, the outcome of his trial would have been different. *Mobley v. State*, 271 Ga. 577 (523 SE2d 9) (1999), citing *Strickland v. Washington*, 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984). This he cannot do.

At the hearing on Moody's motion for new trial, trial counsel testified that he remembered particulars about Moody's trial and that he spoke with Moody's mother but that he did not recall either the mother or Moody himself relating where Moody was on the night of the incident. Counsel added that he suspected that if anybody had timely mentioned alibi to him, there would have been no reason why he would not have investigated and pursued it. Moreover, Moody's mother and sister both testified at the hearing, and even if the trial court found credible their assertions that they remembered, more than four years later, Moody's whereabouts on November 28, 1995, their testimony did not establish an alibi for the murder. The State's evidence permitted the jury to find that the fatal beating occurred on either November 27, 1995 or November 28, 1995.[9] Even accepting that the beating occurred on the 28th, Moody's mother's and sister's testimony of Moody's whereabouts at the apparent time of the beating was not consistent and, in no manner, ruled out his commission of the murder.[10]

*Judgment affirmed. All the Justices concur.*

DECIDED OCTOBER 23, 2000.

*Dell Jackson*, for appellant.

*Paul L. Howard, Jr., District Attorney, Bettieanne C. Hart, Assistant District Attorney, Thurbert E. Baker, Attorney General, Daniel G. Ashburn, Assistant Attorney General*, for appellee.

---

[9] A paramedic on the scene testified that he responded to the incident on the 27th or 28th. At one point, Gay expressed some confusion about what day of the week the beating occurred.

[10] Moody's mother testified that she remembered the night of November 28, 1995 because Moody suffers from allergies and he stayed in bed "most of that night"; November 27, 1995 was Moody's son's birthday and Moody had his son with him; Moody's birthday was on November 29 so Moody went to the store on the 28th and bought something and came back home; Moody stayed at home "from like 3:00 o'clock on." Yet, Moody's sister testified that Moody left at about 9:00 p.m. or 10:00 p.m. to take his children home, that the trip took 30 or 40 minutes each way, and that she did not look at the clock when Moody returned.