S03A1749. MILLER v. THE STATE.
(593 SE2d 659)

HINES, Justice.

Angela Hope Miller ("Miller") appeals from her convictions for felony murder and aggravated battery, in connection with the death of Jacob Miller.[1] For the reasons that follow, we affirm.

Construed to support the verdicts, the evidence showed that Jacob Miller, who was 22 months old, was the foster child of Miller and her husband, Fred Miller; Jacob was the son of Fred Miller's sister. The Millers had two other young children, both under the age of four. On the morning of Jacob's death, Fred Miller left home hurriedly, as he was late for the 8:00 a.m. start of his job; Jacob called to him not to leave, but Fred Miller did not see Jacob. At 7:55 a.m., Angela Miller took Jacob to a neighbor's home and placed a telephone call to emergency services; the child appeared to be unconscious. Miller told the emergency services operator that: she needed an ambulance; Jacob had "started puking" that morning; he was breathing and looked "all right"; he had hit his head the day before; he was pale and coughing; he was generally clumsy; the only way he could get out of bed was by falling out; he had been out of bed at 1:00 a.m.; and he might have hit his head falling out of bed. Emergency medical

---

existence of the prior deed.

[1] Jacob Miller died on November 20, 1997. On December 8, 1997, a Cherokee County grand jury indicted Miller for felony murder while in the commission of cruelty to a child, cruelty to a child, aggravated assault, and aggravated battery. Miller was tried before a jury March 23-27, 1998, and was found guilty of all charges. On March 30, 1998, she was sentenced to life in prison for felony murder and 20 years in prison for aggravated battery, to be served concurrently with the life term; the charges of cruelty to a child and aggravated assault merged with the felony murder. See *Malcolm v. State*, 263 Ga. 369, 372-374 (5) (434 SE2d 479) (1993). Miller moved for a new trial on April 29, 1998, and her motion was denied on June 6, 2002. Miller's notice of appeal was filed on July 3, 2002, the appeal was docketed in this Court on August 12, 2003, and submitted for decision on October 6, 2003.

personnel responded in a few minutes, and four minutes later took Jacob to the local hospital, from which he was transported to a children's specialty hospital. A radiological scan of his head revealed a blood clot pressing upon his brain, and surgery was initiated; he did not survive.

At the local hospital, a nervous Miller told a social worker that she was bathing Jacob and he threw his head back, hitting it against the sink. She then said that she was feeding Jacob while he was seated in a chair, he flung himself back, and hit his head on the wall; she gave multiple versions of these stories. She did not want to see Jacob before he was transported, and described Jacob as a problem child, developmentally disabled, who often threw temper tantrums and banged his head.

Miller's first statement to police was that: Jacob awoke at 1:00 a.m.; she put him back in bed; he immediately knocked on the door, wanting to leave his room; he went back to sleep by 3:00 a.m.; when Fred Miller left for work, she went to Jacob's room, he walked out, and she found that he had soiled his diaper; she took Jacob to the kitchen sink to give him a bath; he bumped his head on the side of the sink four times, and once on a canister next to the sink, either "throwing a fit" or slipping; she removed him from the sink and he began to mumble; he looked "spaced out"; she shook him to revive him; he would not respond to efforts to make him eat; and she took Jacob next door to call an ambulance. The police questioned the veracity of her statement, and Miller added that: when she removed Jacob from his bed that morning, she dropped him on the carpeted floor; when she removed his pajamas prior to bathing him, he threw himself backwards onto the floor, hitting his head; Jacob's head struck the door frame as she was carrying him on the way to the neighbor's home; and his head also struck the neighbor's parked vehicle en route. She then said that she had shaken Jacob, but did not intend to kill him.

Miller was arrested and gave another statement to the police. In terms of reciting the instances in which Jacob had struck his head, this statement was consistent with the version of events she had given after the police had questioned her veracity regarding the first statement, although she was not now certain whether Jacob's head had firmly struck the neighbor's vehicle, or only grazed it. Additionally, Miller stated that: when she was attempting to bathe Jacob, he began screaming for Fred Miller; she was angry with Jacob; she picked him up; and she shook him and cursed him.

Medical evidence showed that Jacob died of a combination of being shaken, blunt force trauma to the head, and injuries to the spinal cord. There was bruising on his head and torso.

1. Miller challenges the sufficiency of the evidence, specifically

arguing that she could not be found guilty of felony murder based on the crime of cruelty to a child, because there was no evidence that she "maliciously" caused Jacob cruel and excessive pain, for her testimony was that she had no intention to harm him. See OCGA § 16-5-70 (b). But, the jury was not required to accept her trial testimony as true; it was empowered to judge her credibility and weigh her testimony against other evidence. See *Watkins v. State*, 273 Ga. 307, 309 (1) (540 SE2d 199) (2001). The physical evidence and Miller's varying versions of events authorized the jury to find her guilty of felony murder while in the commission of cruelty to a child, to find her guilty of aggravated battery, and to reject her evidence and hypotheses presented in an attempt to refute the charges. *Jackson v. Virginia*, 443 U. S. 307 (99 SC. 2781, 61 LE2d 560) (1979); *Watkins*, supra.

2. Miller contends the trial court erroneously admitted into evidence certain photographs of the victim's body or portions thereof. There are three sets of photographs at issue: those taken at the hospital after Jacob had been declared dead; those taken immediately before the autopsy; and those taken during the autopsy which depict internal organs and damage to those organs.

The photographs taken at the hospital showed tubes, cardiac leads, and tape applied by medical personnel to Jacob's body. Miller claims these attachments should have been cropped from the photographs as they were alterations to the body that were not the result of the crimes charged. See *Heard v. State*, 257 Ga. 1, 2 (2) (a) (354 SE2d 115) (1987).[2] But the medical attachments of which Miller complains were "standard treatments and procedures initiated to attempt resuscitation of the child." *Jackson v. State*, 276 Ga. 94, 95 (2) (575 SE2d 447) (2003). Generally, such photographs are not improperly inflammatory. See *Avila-Nunez v. State*, 237 Ga. App. 649, 651 (1) (e) (516 SE2d 335) (1999). The photographs showed the injuries suffered by the victim and the trial court did not abuse its discretion in admitting them.

As to those photographs taken immediately prior to the autopsy incisions, "[p]re-incision autopsy photos depicting the location and nature of the victim's wounds are relevant and material and are therefore admissible. [Cit.] The trial court has broad discretion in balancing the probative and prejudicial nature of such photos. . . . [Cit.]" *Oliver v. State*, 276 Ga. 665, 668 (5) (581 SE2d 538) (2003). Miller nonetheless contends that these photographs duplicated the views presented in the hospital photographs. First, we note that sev-

---

[2] Examination of these photographs shows that on most the medical devices are so positioned in relation to the injuries that cropping them in the manner suggested would be difficult if not impossible.

eral of the photographs show different views of the body or detail different injuries. See *Wyatt v. State*, 272 Ga. 490, 492 (3) (532 SE2d 390) (2000). Further, these photographs are material, relevant, and admissible to show the extent and nature of the victim's wounds, even if they are to some degree duplicative. *Floyd v. State*, 272 Ga. 65, 68 (4) (525 SE2d 683) (2000).

Post-incision autopsy photographs of the victim "are admissible if necessary to show some material fact that becomes apparent only due to the autopsy." *Peterson v. State*, 274 Ga. 165, 171 (5) (549 SE2d 387) (2001). These autopsy photographs showed injuries under the scalp, to the brain, and to the interior of the torso, and demonstrated the extent of trauma to Jacob's head and the force with which he had been held. None of this could have been shown simply by photographs of the outside of the body.[3]

Finally, Miller asserts that the trial court should have ruled that the probative value of all the contested and admitted photographs was substantially outweighed by the danger of undue prejudice to her. See *Whitaker v. State*, 275 Ga. 521, 522 (2) (570 SE2d 317) (2002). Graphic photographs of the badly injured body of a young child certainly carry the danger of undue prejudice. But, these photographs were relevant to issues before the jury and possessed a large measure of probative value. The trial court did not, in this instance, abuse its discretion by admitting them. Id.

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 8, 2004 —
RECONSIDERATION DENIED MARCH 29, 2004.

*Gregory A. Hicks, James K. Luttrell*, for appellant.
*Garry T. Moss, District Attorney, Rosemary Kittrell, Assistant District Attorney, Thurbert E. Baker, Attorney General, Frank M. Gaither, Jr., Assistant Attorney General*, for appellee.

---

[3] In this Court, Miller asserts that the admission of a radiological scan of Jacob's head while he was still alive rendered unnecessary the autopsy photographs of the interior of the skull. However, Miller did not raise this objection before the trial court and appellate review on this issue is therefore waived. *Gordon v. State*, 273 Ga. 373, 378 (5) (541 SE2d 376) (2001).