S08A0121. SEWELL v. THE STATE.
(662 SE2d 537)

HINES, Justice.
Jeffery D. Sewell appeals his convictions for felony murder while in the commission of aggravated assault and possession of a firearm while in the commission of a crime in connection with the death of Anthony Edward Thomas Moore. For the reasons that follow, we affirm.[1]

---

[8] Id.

[1] Moore was killed on February 8, 1999. On May 4, 1999, a Fulton County grand jury indicted Sewell for malice murder, felony murder while in the commission of aggravated assault, aggravated assault, and possession of a firearm during the commission of the crime of aggravated assault. Sewell was tried before a jury June 2-6, 2003, and found not guilty of malice murder, but guilty on all other counts. On June 6, 2003, the trial court sentenced Sewell to a term of life in prison for felony murder and a consecutive term of five years in prison for possession of a firearm during the commission of a crime; the aggravated assault charge merged with the felony murder. See *Malcolm v. State,* 263 Ga. 369, 372-374 (5) (434 SE2d 479) (1993). On September 11, 2006, Sewell was granted permission to file an out-of-time appeal; he filed a motion for a new trial on September 12, 2006, which the trial court denied on July 13, 2007.

Construed to support the verdicts, the evidence showed that Moore went to an area known for illegal drug sales in the evening, seeking to purchase cocaine. He approached a group of men that included Sewell and asked if they would be willing to exchange cocaine for his watch. Sewell and the others said they were not interested in his watch and told Moore to leave. Moore, who was Caucasian, directed a racial epithet toward Sewell, who is African-American. Sewell approached Moore angrily, as though to fight, and shot Moore, fatally, in the chest; one of his friends implored Sewell not to shoot Moore again, and his pistol apparently would not fire a second time.

After the shooting, Sewell went home, hid the pistol, awakened his mother, and told her that he had witnessed a shooting; Sewell was 15 years old at the time. Sewell discussed the matter with his family members the next day; it was decided that Sewell would give a statement to the police, and his mother telephoned the police and told them that she had trouble with her son. Police officers came to Sewell's house, and he was driven to the police station in a police car; his mother, grandmother, and step-grandfather went to the police station in a different car. At the police station, Sewell admitted to a detective that he shot Moore.

1. Sewell challenges the sufficiency of the evidence as to the crime of felony murder, contending that since the jury acquitted him of malice murder, it must have necessarily concluded that he shot Moore as the result of provocation, and that he should have thus been convicted of only voluntary manslaughter, rather than of felony murder while in the commission of aggravated assault. However, "[w]hether the evidence showed only voluntary manslaughter resulting from a serious provocation was a question for the jury. [Cit.]" *Jones v. State*, 282 Ga. 47, 48 (1) (644 SE2d 853) (2007). The jury was properly instructed that words alone could not produce sufficient provocation to reduce the crime to voluntary manslaughter, and that it was to determine Sewell's motive. See *Todd v. State*, 274 Ga. 98, 101-102 (4) (549 SE2d 116) (2001). And, the jury rejected the voluntary manslaughter option on the special verdict form, finding instead that Sewell was guilty of felony murder. Although Sewell testified that he believed Moore was reaching for a weapon, police investigators testified that Sewell had not told them that, and the jury was not required to accept as true the version of events to which Sewell testified, but could assess his credibility and weigh his testimony against other evidence. *Miller v. State*, 277 Ga. 707, 709 (1) (593 SE2d

Sewell filed a notice of appeal on July 23, 2007, his appeal was docketed in this Court on September 24, 2007, and submitted for decision on November 19, 2007.

659) (2004). The evidence was sufficient to enable a rational trier of fact to find Sewell guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. The State introduced testimony of the versions of events that Sewell gave to the police detective while he was at the police station. Sewell stated that: he was with several friends when Moore approached and asked to exchange his watch for cocaine; the group denied having cocaine and told Moore to leave; as Moore turned and walked away, Moore used a racial epithet; Sewell turned and began to walk away; and Sewell did not hear a gunshot. The detective asked for more information, noting that in these circumstances, Sewell should have heard a gunshot; Sewell then said that he was later told by a friend that Moore had been shot and killed. Again, the detective asked for more specific information, and Sewell said that he had seen who shot Moore, and that the shooter ran into the woods afterwards. The detective then opined that true friends would not put Sewell in a position to be a witness to murder, and that he should tell the absolute truth. At this point, Sewell stated that he had shot Moore, and that after Moore used a racial epithet, Sewell approached him, demanding that he repeat what he had said, Moore did so, and Sewell shot him; Sewell said that he had been aggravated by an incident earlier in the day involving a dice game, and had armed himself in anticipation of trouble.[2]

Sewell asserts that these oral statements were made without the benefit of *Miranda*[3] warnings and that evidence about them should have been excluded from his trial. First, it must be noted that no written statement from Sewell was introduced at trial. At the *Jackson v. Denno*[4] hearing, police officers testified that Sewell was not placed in custody, and was not given *Miranda* warnings, until after he admitted to the shooting and had completed a written statement. During argument at the hearing, the trial court announced that it agreed that Sewell was not in custody at the time he orally implicated himself as the shooter, and the State announced it would not introduce the written statement during its case-in-chief.[5] A person is considered to be in custody and "*Miranda* warnings are required

---

[2] At a pre-trial hearing, the detective testified that he did not place Sewell in custody immediately upon Sewell's admission because he was suspicious that Sewell might be concealing the identity of the true shooter, he wanted to ask verifying questions, and that in any event, he would give all the information he gained to the lead detective on the case, who would make the final decision regarding arrest.

[3] *Miranda v. Arizona,* 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[4] *Jackson v. Denno,* 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

[5] At trial, Sewell testified in his own defense and portions of the written statement were read aloud for purposes of impeachment. See OCGA § 24-9-83.

when a person 'is (1) formally arrested or (2) restrained to the degree associated with a formal arrest.' [Cit.] Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary. [Cit.]" *Robinson v. State,* 278 Ga. 299, 301 (2) (602 SE2d 574) (2004). "On appeal, the issue is whether the trial court was clearly erroneous in its factual findings regarding the admissibility of the statements. [Cit.]" *Jackson v. State,* 272 Ga. 191, 193 (3) (528 SE2d 232) (2000).

Sewell takes issue with the trial court's finding that he was not in custody when he told the police officer that he was the shooter, relying upon the fact that his step-grandfather told a police officer who responded to the Sewell home that Sewell had stated that he shot Moore; Sewell argues that he thus must have been considered by the police to be the perpetrator and would not have been considered free to go if he had attempted to leave the presence of police officers. However, the police officer who transported Sewell to the police station testified that Sewell was not in custody during the trip, and that had Sewell requested it, he would have allowed Sewell to leave the police car. Further, the detective who conducted Sewell's interview at the police station testified that, as far as he knew, Sewell was there only as a witness.

Even if the declaration of Sewell's step-grandfather that Sewell had admitted the shooting had been communicated to other officers and police attention had been focused upon Sewell, the question of whether a person is in police custody for purposes of *Miranda* warnings is not controlled by the fact that a police officer is told by a third party that the person has admitted a crime.

> Whether a police officer focused his unarticulated suspicions upon the individual being questioned is of no consequence for *Miranda* purposes. [Cit.] This is so because *Miranda* was fashioned to redress " 'the compulsive aspect of custodial interrogation, and not the strength or content of the government's suspicions' " when the questioning commenced. [Cit.] "Even a clear statement from an officer that the person under interrogation is a prime suspect is not, in itself, dispositive of the custody issue, for some suspects are free to come and go until the police decide to make an arrest." [Cit.] Thus, the proper inquiry is whether the individual was formally arrested or restrained to the degree associated with a formal arrest, not whether the police had probable cause to arrest. [Cits.] In resolving this issue, the "relevant inquiry is how a reasonable person in [the] suspect's position would perceive his situation." [Cit.]

*McAllister v. State*, 270 Ga. 224, 227-228 (1) (507 SE2d 448) (1998).

Although Sewell was transported to the police station in a car which had a security screen between the front and back passenger seats, and a pat-down search for officer safety was performed before he entered the car, these actions do not mandate a finding that he was in custody. See *Scott v. State*, 281 Ga. 373, 375-376 (2) (637 SE2d 652) (2006). At no time was Sewell handcuffed, his mother, grandmother, and step-grandfather were present during the interview, and the door to the detectives' work area in the police station was not locked in any way that impeded exit.[6] The detective who conducted the interview had no information regarding any prior admission on Sewell's part, and there is no evidence that Sewell was aware that his step-grandfather had informed a responding police officer that he had admitted shooting Moore. The trial court did not err in ruling that a reasonable person in Sewell's position would not perceive himself to be in police custody when he orally confessed to shooting Moore. Although Sewell asserts in this Court, for the first time, that the trial court should have considered the factors set forth in *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922) (1976), this argument is meritless; *Riley* addresses a juvenile's waiver of his *Miranda* rights while in police custody. Id. Accord *Green v. State*, 282 Ga. 672, 673-674 (2) (653 SE2d 23) (2007).

3. During the State's closing argument, the prosecutor began to discuss the legal purpose of *Miranda* warnings, and Sewell objected that instructing the jury on the law and "historical meaning of *Miranda*" was improper argument. An unrecorded colloquy was held at the bench, after which the trial court instructed the jury that the court had ruled that *Miranda* was not applicable in this case, and that it presented no issue for the jury's consideration. The State then resumed its argument. Sewell now complains that the court's instruction after his objection was improper. However, he never objected to the court's instruction, and thus cannot now complain about it. See *Walker v. State*, 282 Ga. 774, 778-779 (8) (653 SE2d 439) (2007); *Moody v. State*, 273 Ga. 24, 26-27 (3) (537 SE2d 666) (2000); *Wilson v. State*, 268 Ga. 527, 528-529 (2) (491 SE2d 47) (1997).

*Judgments affirmed. All the Justices concur, except Sears, C. J., Hunstein, P. J., and Carley, J., who concur specially.*

SEARS, Chief Justice, concurring specially.

Because the record shows that a reasonable person in Sewell's position would have perceived himself to be in custody when he made

---

[6] Entry to the area required clearance from an attendant and an action unlocking the door, but the lock was not set to prevent exits.

his incriminating statement to the police, I disagree with Division 2 of the majority opinion in which the Court concludes that Sewell was not in custody when he was interviewed at the homicide office and that the statement he made to the police was therefore admissible at trial. I also conclude, however, that the admission of Sewell's statement was harmless error, and I thus concur in the affirmance of Sewell's conviction.

In reviewing the trial court's denial of Sewell's motion to suppress, we will defer to the trial court's findings of disputed facts but will review de novo the trial court's application of the law to the undisputed facts.[7] Further, in determining whether a suspect is in custody, a court must consider "the circumstances surrounding the interrogation" and then ascertain whether, under those circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."[8] In addition, "[w]hether a custodial situation exists does not depend upon 'the subjective views harbored by either the interrogating officers or the person being questioned.' "[9] Instead, " '[t]he only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his [or her] situation.' "[10]

In the present case, Sewell's step-grandfather testified at the *Jackson-Denno*[11] hearing that Sewell's mother called him on the night of the crime and told her that Sewell said that he had shot someone. The step-grandfather testified that he was like a father figure to Sewell, who was 15 at the time of the crime, and that the next morning, he and Sewell's grandmother went to Sewell's mother's house. According to the step-grandfather, he and the rest of Sewell's family encouraged Sewell to turn himself in, and Sewell's mother called the police and asked them to come to her house.

Officer James Clements testified that he was the second officer to arrive at the house and that, when he arrived, the first officer (Officer Sands), Sewell, and Sewell's grandmother and step-grandfather were sitting in a room together. Officer Clements stated Officer Sands asked him to step out of the room and that, when he did so, Officer Sands told him that Sewell's step-grandfather had told him that Sewell had shot and killed someone. Officer Clements went back to

---

[7] *Petty v. State*, 283 Ga. 268, 269 (658 SE2d 599) (2008); *State v. Nash*, 279 Ga. 646, 648 (619 SE2d 684) (2005).

[8] *Thompson v. Keohane*, 516 U. S. 99, 112 (116 SC 457, 133 LE2d 383) (1995). Accord *Petty*, 283 Ga. at 269.

[9] *Hightower v. State*, 272 Ga. 42, 43 (526 SE2d 836) (2000), quoting *Stansbury v. California*, 511 U. S. 318, 323 (II) (114 SC 1526, 128 LE2d 293) (1994).

[10] *Hightower*, 272 Ga. at 43, quoting *Berkemer v. McCarty*, 468 U. S. 420, 442 (III) (104 SC 3138, 82 LE2d 317) (1984).

[11] *Jackson v. Denno*, 378 U. S. 368 (84 SC 1774, 12 LE2d 908) (1964).

the room where Sewell was sitting with his grandmother and step-grandfather and asked to speak to the step-grandfather. Clements added that the step-grandfather then told him that Sewell had told him that he had shot and killed someone the night before. Clements and the step-grandfather then went back into the room in which Officer Sands, Sewell, and Sewell's grandmother were sitting. Clements did not have a conversation with Sewell at the house. According to Officer Clements, he then called the homicide office and told them what the step-grandfather had told him, and he stated that the homicide office told him to bring Sewell and the step-grandfather to the station to make a statement. After speaking with the homicide office, Officer Clements informed Sewell and his step-grandfather that they both would have to go to the homicide office to make statements. Neither Officer Sands nor Officer Clements nor the officer who conducted Sewell's interview at the homicide office told Sewell that he was not under arrest and was free to leave.

Sewell's step-grandfather also testified at the *Jackson-Denno* hearing. He testified that, when he arrived at Sewell's mother's house, Sewell told him that he had shot the victim. The step-grandfather added that, when Officer Sands and Officer Clements arrived at the house, he told both officers that Sewell had told him that he had shot and killed the victim. After the step-grandfather spoke with Officer Clements, the step-grandfather testified that he, Officer Clements, and Officer Sands went back into the room in which Sewell was sitting with his grandmother. The step-grandfather stated that the officers briefly questioned Sewell and that Officer Clements then told Sewell and the step-grandfather that they would need to go to the homicide office to make statements. According to the step-grandfather, Officer Clements told Sewell that he would have to ride with Officer Clements to the homicide office.

Subsequently, Officer Sands and Officer Clements required Sewell to ride to the homicide office in Officer Clements's police vehicle, as it had a security screen between the officer and the back seat and Officer Sands's vehicle did not. Officer Clements also patted down Sewell before he entered the police vehicle. Sewell's mother rode with Officer Sands to the homicide office, and his grandmother and step-grandfather drove their own vehicle.

Under the foregoing circumstances, I conclude that a reasonable person in Sewell's position would not have felt free to terminate his interview with police officers and to walk out of the police station. First, based on the facts that Sewell had told his family that he had shot and killed the victim; that his family called the police to come to his house; that his step-grandfather had encouraged Sewell to turn himself in; that Sewell saw his step-grandfather have conversations with two police officers; that, shortly after those conversations,

Sewell and his step-grandfather were told they had to go to the homicide office to make statements; and that Sewell was patted down and transported in a secure police vehicle while his relatives were permitted to take their own private transportation if they so desired,[12] a reasonable person in Sewell's position would conclude that his step-grandfather told the officers that Sewell had confessed to the shooting. The majority errs in concluding to the contrary.[13] Moreover, based on the foregoing factors, as well as on the fact that no police officer ever told Sewell that he was not under arrest and was free to leave,[14] a reasonable person in Sewell's position also would conclude that the officers intended to question him about his role in the shooting and that the officers would not permit him to stop the interview and leave the police station.

Although the majority relies on the subjective intent of the police officers to the effect that Sewell was not under arrest and was free to leave, the question whether a custodial situation existed does not turn on the officers' subjective views, but instead depends upon how a reasonable person in Sewell's position would have perceived his situation.[15] The majority also relies on the presence of the defendant's family during the interview as a factor favoring the conclusion that Sewell would have felt free to leave the homicide office. Although the presence of close relatives during a police interview might generally support the majority's position, it does not do so in this case. Instead, as Sewell's relatives had encouraged Sewell to turn himself in, as Sewell had confessed to them, and as shortly after his confession to them, he was transported to a homicide office in a secure police vehicle, I cannot conclude that their presence would have led Sewell to feel that he was free to leave the homicide office.

For the foregoing reasons, I conclude that a reasonable person in Sewell's position would not have thought that he was free to leave the homicide office and that he was thus in custody for purposes of *Miranda*.[16] Because Sewell did not receive the warnings required by *Miranda* before he made his statement, the trial court erred in

---

[12] See *Yarborough v. Alvarado*, 541 U. S. 652, 664 (124 SC 2140, 158 LE2d 938) (2004) (the fact that the police did not transport a defendant to the station or require him to appear is a factor that weighs in favor of a finding that the defendant was not in custody).

[13] Majority opinion at p. 562.

[14] *Gabriel v. State*, 280 Ga. 237, 237-238 (626 SE2d 491) (2006) (if an officer tells a suspect that he is not under arrest or is free to leave before he makes a statement, it is a factor supporting the conclusion that the defendant was not in custody); *Yarborough*, 541 U. S. at 665 (if an officer does not tell a suspect that he is free to leave, this factor "weigh[s] in favor of the view that [the suspect] was in custody.").

[15] *Cook v. State*, 274 Ga. 891, 894-895 (561 SE2d 407) (2002); *Hightower*, 272 Ga. at 43; *Stansbury*, 511 U. S. at 323-324; *Berkemer*, 468 U. S. at 441-442.

[16] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

admitting his statement into evidence. Accordingly, I disagree with Division 2 of the majority opinion in which the Court affirms the trial court's decision to admit the statement.

However, because I also conclude that there was overwhelming evidence of Sewell's guilt, including Sewell's admission of guilt to his step-grandfather, with whom Sewell was very close, I would affirm his conviction.[17]

I am authorized to state that Presiding Justice Hunstein and Justice Carley join in this special concurrence.

DECIDED JUNE 2, 2008.

*Carl P. Greenberg*, for appellant.
*Paul L. Howard, Jr., District Attorney, Elizabeth A. Baker, Bettieanne C. Hart, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Mary N. Kimmey, Assistant Attorney General*, for appellee.

---

[17] *Frazier v. State*, 278 Ga. 297, 298 (602 SE2d 588) (2004).