## A11A1564. ANGUIANO v. THE STATE.

(721 SE2d 652)

MIKELL, Chief Judge.

Reymundo Anguiano was indicted for criminal attempt to commit child molestation, OCGA § 16-6-4 (a), and criminal attempt to commit enticing a child for indecent purposes, OCGA § 16-6-5 (a). He moved to suppress videotaped statements he made during a pre-arrest interview with a television correspondent. Following a hearing at which the arresting officer testified, the trial court denied the motion. The videotape in question was viewed by the jury at Anguiano's trial, and he was found guilty on both charges. He appeals the denial of his amended motion for new trial, contending that the trial court erred in denying his pretrial motion to suppress. Discerning no error, we affirm.

Anguiano argues that the trial court erred in ruling that his pre-arrest statement was voluntarily made in a non-custodial setting and was therefore admissible in evidence even though he was not given prior *Miranda*[1] warnings.

*Miranda* warnings "are required only when a law enforcement officer [or agent] initiates questioning of an individual who has been taken into custody or otherwise significantly deprived of his freedom."[2]

> A person is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary.[3]

Further, in addressing this issue, "the relevant inquiry is how a reasonable person in the suspect's position would perceive his situation."[4] "Whether one is in custody for *Miranda* purposes is a mixed question of law and fact";[5] and on appellate review, we will not disturb the findings of fact that underpin the trial court's legal conclusions made at a suppression hearing, "unless they are clearly

---

[1] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[2] (Citation and emphasis omitted.) *Glean v. State*, 197 Ga. App. 34, 35 (4) (397 SE2d 459) (1990), citing *Grogins v. State*, 154 Ga. App. 606, 607 (2) (269 SE2d 98) (1980).

[3] (Punctuation omitted.) *State v. Folsom*, 285 Ga. 11, 12-13 (1) (673 SE2d 210) (2009), citing *Sewell v. State*, 283 Ga. 558, 560-561 (2) (662 SE2d 537) (2008).

[4] (Citations and punctuation omitted.) *McAllister v. State*, 270 Ga. 224, 228 (1) (507 SE2d 448) (1998). Accord *Sewell*, supra at 561 (2).

[5] (Footnote omitted.) *Axelburg v. State*, 294 Ga. App. 612, 613 (1) (669 SE2d 439) (2008).

erroneous."[6] In the case at bar, the evidence supports the trial court's ruling, and we find no clear error.

The record reflects that Anguiano was caught in a ruse intended to catch child molesters who operate on-line. The ruse used adult decoys posing on the internet as underage girls to lure adult males to a house under the pretense that an unsupervised girl was waiting to have sex with them. The operation was run jointly by NBC, which was filming a television production about catching on-line sexual predators, and Perverted Justice ("PJ"), a "watchdog group" dedicated to exposing adults who use the internet to seek sexual activity with children. The Harris County Sheriff's Office invited PJ to film the NBC show locally and helped NBC find an appropriate location, an unoccupied dwelling with a detached carport separated by some 15 feet from the house. NBC arranged to rent the house, and NBC's crew brought in "truckloads of equipment," which they set up inside the house. NBC allowed the police to set up a "control room" in a room located over the carport, but the officers were not ever allowed inside the house. The sheriff's office did not pay NBC or PJ in connection with the filming, nor did NBC or PJ make any payments to the sheriff's office.

On July 22, 2006, Anguiano began chatting on-line with a person whom he believed to be an under-age girl, but who was actually an adult posing as a 14-year-old girl. This adult was working as a decoy for PJ. In the course of the chats, which were not monitored or observed by law enforcement officers, Anguiano indicated that he wanted to meet with the "girl" for sex. That same day, Anguiano drove several hours in order to meet with the "girl" at an arranged location — the house which had been rented by NBC. When he arrived, the decoy greeted him and beckoned him to come into the house for some "sweet tea." She then disappeared inside the house. When Anguiano entered the house, Chris Hansen, a television correspondent with NBC, emerged from an inner room. Hansen calmly asked Anguiano to "sit down" and to "do me a favor, let me see your hands."

Hansen then proceeded to interview Anguiano, questioning him about his intent in coming to the house and about the nude picture he had sent to the decoy over the internet. Anguiano was not informed of his rights under *Miranda* before this interview took place. During the interview, which was videotaped, Anguiano made several incriminating statements, such as that he brought a condom with him to the rendezvous with the decoy. Anguiano also acknowl-

---

[6] (Citation and punctuation omitted.) *Hendrix v. State*, 230 Ga. App. 604, 605 (1) (497 SE2d 236) (1997). Accord *Durrence v. State*, 307 Ga. App. 817, 818 (1) (706 SE2d 180) (2011).

edged that he had seen the NBC show and that he thought he was going to be "processed." Hansen revealed that he was with "Dateline NBC" and told Anguiano that he was free to leave. NBC cameramen surrounded Anguiano, who began to leave hesitantly, still wondering if he was going to be "processed."

When Anguiano left the house, he was arrested. Lt. Sven Armbrust, an officer with the Harris County Sheriff's Office since 1994, was the ranking officer on the scene on the day of Anguiano's arrest. Earlier that day, Del Harvey, an employee of PJ, had given Armbrust copies of the chat logs between Anguiano and the decoy, which indicated that Anguiano might show up at the house. Armbrust testified that Harvey worked for PJ and was not a "law enforcement person." According to Armbrust's testimony, no law enforcement officers were visible to Anguiano when he arrived at the house; Anguiano had no contact with law enforcement until after he exited the house; and the arresting officers left the carport room and took position outside the residence only after Anguiano had already gone inside. Armbrust testified that he had no conversations with Hansen at all; that the police officers "didn't have any direct contact with what NBC was to do"; and that the police had no prior arrangement with Chris Hansen as to whether Hansen would interview Anguiano at all or, if an interview took place, what questions Hansen might ask. Based on his familiarity with the television show, however, Armbrust anticipated that the event would be videotaped and that an interview with the suspect would take place.

The trial court credited Armbrust's testimony and found that in conducting the interview at issue, Hansen was not acting as an agent of the police; that Anguiano was not "in custody" when the interview occurred; and therefore, that no prior Miranda warning was required and the statements at issue were admissible. Anguiano contends that he was "in custody" when he arrived at the house and answered Hansen's questions, because Hansen was working on a joint venture run by NBC, PJ, and the sheriff's office; and because, as it turned out, Anguiano was arrested once he left the house. Because the trial court's determination is supported by some evidence in the record, we conclude that it is not clearly erroneous.

In determining if an individual is in custody for purposes of Miranda, "courts must inquire into whether that person's freedom of movement was restrained to a degree associated with a formal arrest."[7] In addressing this issue, we consider whether, under the

---

[7] (Citation and punctuation omitted.) Grayer v. State, 282 Ga. 224, 228 (3) (647 SE2d 264) (2007). Accord Hendrix, supra.

totality of the circumstances, "a reasonable person would have felt at liberty to terminate the interrogation and leave."[8] Because "[t]he standard is an objective one,"[9] a "reasonable person" is "one neither overly apprehensive because of criminal conduct nor insensitive to the seriousness of the circumstances."[10] Applying these guidelines, we find no error in the trial court's ruling that Anguiano was not in custody for *Miranda* purposes when he made the statements at issue to Hansen.

"*Miranda* warnings are not a prerequisite to the admission of statements made by a defendant to persons other than law enforcement officers or their agents."[11] In determining whether Hansen was acting as an agent of the state, we again look at the totality of the circumstances.[12] Although the sheriff's office initially invited PJ and NBC into the county and identified a house for NBC to rent, it was NBC that arranged to rent the house, paid the rent, and directed the film production. The scheme to engage on-line predators was devised by PJ, not by police; and the on-line chats which lured Anguiano to the house were conducted by PJ without police monitoring, supervision, or direction. No one at NBC or PJ was paid by the sheriff's office; the sheriff's office did not authorize them to act nor did it direct their actions, in particular with regard to the questions Hansen chose to ask in the interview or even as to whether such an interview would take place at all; and the interviewer, Hansen, was found by the court to be "an aggressive television newsreporter pursuing his professional employment[, and] not involved in law enforcement or employed by any state agency." Further, police were not present at Hansen's interview with Anguiano; indeed, they were not even in the building. The mere fact that there was cooperation between the private entities involved and the police does not by itself create an agency relation.[13] We conclude that there was evidence to support the trial court's finding that Hansen was not an agent of the state.

---

[8] (Citation and punctuation omitted.) Id. Accord *Durrence*, supra at 819 (1).

[9] *Durrence*, supra.

[10] (Punctuation and footnote omitted.) *Axelburg*, supra.

[11] (Citations omitted.) *Bethea v. State*, 251 Ga. 328, 330-331 (7) (304 SE2d 713) (1983) (statements made by defendant while incarcerated to his Army commanding officer were admissible). See *Harper v. State*, 249 Ga. 519, 528 (4) (b) (292 SE2d 389) (1982) (female who visited defendant in jail was not acting as agent of FBI even though FBI knew she was visiting and paid her travel expenses).

[12] *In the Interest of T. A. G.*, 292 Ga. App. 48, 51 (1) (b) (663 SE2d 392) (2008), citing *Cook v. State*, 270 Ga. 820, 827 (2) (514 SE2d 657) (1999) (issue of "custody" where challenged statements were made by incarcerated defendant to his father, an FBI agent).

[13] See *Roberson v. State*, 265 Ga. 658, 659 (1) (461 SE2d 212) (1995) (defendants' statements made in media interview were admissible even though interview could not have occurred without police cooperation, where police had no control over the questions posed by reporter).

As to whether Anguiano was "in custody" for *Miranda* purposes when the interview took place, we note that Anguiano came to the location, a private house, of his own free will.[14] There is "no evidence that he was physically restrained or otherwise prevented from leaving the [house] until after he admitted to criminal conduct."[15] The record makes clear that Anguiano's freedom of movement was not restricted until he was placed under arrest after he exited the house. Further, "[e]ven where police have probable cause to arrest at the time of the interrogation and intend to arrest the suspect in the future, the intent to arrest in the future is irrelevant to the custody issue, unless the police communicate the intent during the course of the interrogation."[16] In this case, police were solicitous not to show their presence before Anguiano entered the house, and they certainly did not disclose their view that he was a suspect or that they intended to arrest him later.[17] Also, Anguiano's subjective view of his situation, based on having seen the NBC television show previously, was not determinative of whether he was in custody.[18] Accordingly, the evidence authorized a finding that a reasonable person in Anguiano's position would have believed that he was free to terminate the interview and leave.

We conclude that the trial court did not err in admitting into evidence the statements Anguiano made in the interview with Hansen.

*Judgment affirmed. Smith, P. J., and Dillard, J., concur.*

DECIDED DECEMBER 28, 2011.

*Michael E. Garner*, for appellant.

*Julia Fessenden Slater, District Attorney, Jennifer E. Dunlap, Assistant District Attorney*, for appellee.

---

[14] See *Durrence*, supra (defendant voluntarily went to DFCS office where interview took place).

[15] Id. at 820 (1).

[16] (Citation omitted.) *State v. Billings*, 303 Ga. App. 419, 421 (693 SE2d 627) (2010).

[17] See *Sosniak v. State*, 287 Ga. 279, 281 (1) (a) (1) (695 SE2d 604) (2010).

[18] See *Axelburg*, supra at 615 (1).