In the Supreme Court of Georgia

Decided: January 11, 2021

S20A1288. HARPER v. THE STATE.

BOGGS, Justice.

Appellant Larry Alfonza Harper, Jr., was convicted of the malice murder of his 20-year-old girlfriend, Thandiwe "Tandy" Hunt, as well as concealing her death and tampering with evidence. He contends that the trial court erred in ruling that his pretrial statements to the police in 2011 and 2012 were admissible. We affirm.[1]

---

[1] Hunt was killed on or about February 2, 2011. In December 2012, a Fulton County grand jury indicted Appellant for malice murder, felony murder based on aggravated assault, aggravated assault, concealing the death of another, and tampering with evidence. At a November 2013 hearing, the trial court found that Appellant had made a knowing, intelligent, and voluntary waiver of his right to counsel, granted Appellant's request to represent himself pro se, and directed Appellant's appointed attorney to serve as standby counsel. At a May 2015 trial, the jury found Appellant guilty of malice murder, concealing the death of another, and tampering with evidence but was unable to reach a verdict on the other two charges, which were moved to the dead docket. The trial court sentenced Appellant as a recidivist to serve life in prison

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. In the fall of 2010, Hunt moved from North Carolina to Atlanta to pursue a relationship with Appellant. Appellant and Hunt were not doing well financially and were living in what Jonell Awosika, Hunt's best friend since middle school, described as "cheap hotels." Appellant and Hunt stayed at a hotel in Decatur from November 25, 2010, through January 31, 2011, where the general manager, who lived on the property, saw them together every day.

Hunt wanted to leave Appellant, but whenever she mentioned leaving him, he threatened to hurt her, and she was scared for her life. Hunt's mother last saw Hunt alive the final week of January

without the possibility of parole for malice murder and a total of 11 consecutive years for concealing the death of another and tampering with evidence. Appellant filed a timely motion for new trial, which he later amended through new appointed counsel in July 2017 and July 2019. The trial court held an evidentiary hearing and, on March 12, 2020, entered an order denying the motion. Appellant's notice of appeal ordinarily would have been due 30 days later. See OCGA § 5-6-38 (a). However, on March 14, 2020, in response to the COVID-19 pandemic, Chief Justice Melton issued an Order Declaring Statewide Judicial Emergency that tolled the "time within which to appeal." See OCGA § 38-3-62 (10). Appellant's notice of appeal, which was filed on April 13, 2020, was therefore timely. The case was docketed to this Court's August 2020 term and submitted for decision on the briefs.

2011. On the afternoon of January 30, Awosika spoke to Hunt by telephone. At one point, Hunt put down the phone, and Awosika heard Appellant and Hunt "tussling" in the background. Hunt briefly resumed talking to Awosika and then abruptly said that she would have to call Awosika back and hung up. Awosika never heard from Hunt again, and Hunt no longer posted any content on social media, which was very unusual.

On February 2, 2011, a postal worker delivering mail in Fulton County stopped briefly at a wooded lot, where he saw a suspicious object about 60 feet from the road and called 911. When officers arrived, they found something in the shape of a body completely sealed in two large black trash bags wrapped several times around with duct tape. An officer cut into one of the bags and saw a naked woman inside. The body was transported to the medical examiner's office. There was no identification on or near the body, and for the next three weeks, law enforcement officers were unable to determine who it was. Finally, on February 28, 2011, Hunt's mother identified the body as that of Hunt.

On March 6, 2011, Appellant spoke to the lead detective on the case and another detective at police headquarters. In the video-recorded interview, which was later played for the jury, Appellant admitted that he knew Hunt but insisted that the last time he saw her was in late December 2010 or early January 2011. He denied living with Hunt and claimed that he only met up with her occasionally to have sex, which he said happened no more than ten times from October to December 2010. About halfway through the interview, Appellant consented to give a DNA sample. At the end of the interview, Appellant left police headquarters.

Forensic testing showed that at the time of Hunt's death, she had only a small amount of cannabinoids in her system. The medical examiner concluded in his report that Hunt did not die of a drug overdose, that she had no natural diseases that would explain her death, and that the manner of death was homicide. Hunt had marks on both sides of her neck, and an internal exam revealed small hemorrhages in the right side of her neck and in her larynx and thyroid gland, all of which were consistent with strangulation. The

4

medical examiner determined that Hunt died from strangulation or some other asphyxia-related cause, such as smothering or compression of the chest, and listed "homicidal violence" as the cause of death. Tests run on swabs of Hunt's chest later revealed the presence of saliva containing Appellant's DNA. On July 30, 2012, a Fulton County magistrate judge issued a warrant for Appellant's arrest.

On September 28, 2012, Appellant was arrested and taken to police headquarters, where he spoke to two homicide detectives. The video-recorded interview was later played for the jury. At the outset, Appellant again denied living with Hunt at the hotel in Decatur, saying that he only visited her there and could not remember the last time he saw her because he was involved with "so many women." When the detectives informed Appellant that his DNA was found on Hunt's body, he changed his story, claiming that he deeply loved Hunt, that he found her dead in the hotel room after she committed suicide, and that the reason his DNA was found on her body was because he was crying. According to Appellant, Hunt left him a note,

which he later burned, telling him to get rid of all her things and how she wanted him to dispose of her body, which he followed "step by step." During a break in the interview, one of the detectives lent his cell phone to Appellant to make a call. Appellant told the person he called, "they got me . . . , but I ain't tell them everything. . . . I told them I found the body." After the call, Appellant tore a clock off the wall and attempted to disable a camera hidden inside.

The police obtained hair samples from Appellant to compare to hairs found on Hunt's body and on the duct tape wrapped around the trash bags. An expert in forensic microanalysis concluded that two pubic hairs on the duct tape originated from Appellant or from someone whose pubic hair has the exact same microscopic characteristics, which would be rare.

Appellant does not challenge the legal sufficiency of the evidence supporting his convictions. Nevertheless, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find

6

Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).[2]

2. Appellant contends that the trial court erred in failing to suppress his March 6, 2011 interview, asserting that he was in custody and spoke without a valid waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

> A person is considered to be in custody and *Miranda* warnings are required when a person is (1) formally arrested or (2) restrained to the degree associated with a formal arrest. Unless a reasonable person in the suspect's situation would perceive that he was in custody, *Miranda* warnings are not necessary. On appeal, the issue is whether the trial court was clearly erroneous in its factual findings regarding the admissibility of the statements.

---

[2] We remind litigants that this Court will end its practice of considering the sufficiency of the evidence sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (846 SE2d 83) (2020). The Court began assigning cases to the December Term on August 3, 2020.

7

*Sewell v. State*, 283 Ga. 558, 560-561 (662 SE2d 537) (2008) (citations and punctuation omitted).

Before trial, when Appellant was represented by counsel, the trial court held a hearing pursuant to *Jackson v. Denno*, 378 U.S. 368 (84 SCt 1774, 12 LE2d 908) (1964), to determine the admissibility of the video recordings of Appellant's police interviews. The lead detective testified that on Sunday, March 6, 2011, he called Appellant's uncle, who said that Appellant was at church with his aunt. According to the detective, he went to the church and waited, and when church was over, Appellant walked to a nearby convenience store. The detective and a patrol officer approached Appellant, identified themselves, and asked if Appellant would mind coming to police headquarters to talk about a missing person case. Appellant was "really nice," said that he did not mind going to headquarters to talk with them, and willingly got into the back of the patrol car. Appellant was not told that he was under arrest or handcuffed, and neither the lead detective nor the patrol officer physically took hold of Appellant. The patrol officer drove Appellant

8

to police headquarters and led him to an interview room, where Appellant was interviewed by the lead detective and another homicide detective. A video recording of the interview was admitted at the hearing. The detectives did not threaten Appellant, and when Appellant asked if he was free to leave, the lead detective replied, "At any time." When Appellant expressed concern that his aunt was going to leave church without him, the lead detective offered to give him a ride to his aunt's house. At the end of the interview, which lasted a little more than an hour, Appellant left police headquarters.

The trial court was entitled to credit the lead detective's testimony and to conclude, based on that testimony and the video recording, that a reasonable person in Appellant's situation would not have perceived that he was in custody. Appellant voluntarily went with the lead detective and the patrol officer to police headquarters; was not handcuffed or threatened; was told that he was free to leave at any time and offered a ride; and was allowed to leave when the interview ended. Although the detectives told Appellant that he could not smoke a cigarette in the building or on

9

the grounds and would have to wait until the end of the interview, the lead detective said at the outset that the interview should only take about an hour, which it did. The trial court therefore correctly concluded, based on the totality of the circumstances, that Appellant was not in custody for purposes of *Miranda*. See *California v. Beheler*, 463 U.S. 1121, 1121-1122 (103 SCt 3517, 77 LE2d 1275) (1983) (holding that *Miranda* warnings were not required where suspect was not placed under arrest, voluntarily accompanied police to station house, and was allowed to leave unhindered after brief interview). See also *Howes v. Fields*, 565 U.S. 499, 508-509 (132 SCt 1181, 182 LE2d 17) (2012) ("As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. . . . Determining whether an individual's freedom of movement was curtailed . . . is simply the first step in the analysis, not the last. Not all restraints on freedom of movement amount to custody for purposes of *Miranda*."). Accordingly, this enumeration of error lacks merit.

3. Appellant also contends that the trial court erred in failing to suppress his September 28, 2012 interview, which took place after his arrest on what he asserts was an invalid arrest warrant. Specifically, Appellant claims that the July 30, 2012 warrant for his arrest was issued eleven minutes before the police applied for it, that the warrant did not include the victim's name as required by OCGA § 17-4-41 (a) (1), and that the warrant was issued without any showing to the magistrate judge of probable cause for Appellant's arrest. However, the Fourth Amendment does not require the suppression of statements made outside the home after a warrantless arrest as long as the police had probable cause to make the arrest. See *New York v. Harris*, 495 U.S. 14, 17 (110 SCt 1640, 109 LE2d 13) (1990) (holding that Fourth Amendment does not "grant criminal suspects . . . protection for statements made outside their premises where the police have probable cause to arrest the suspect for committing a crime"); *White v. State*, 307 Ga. 601, 603 (837 SE2d 838) (2020) (holding that Fourth Amendment did not require suppression of defendant's interview at police station

shortly after his warrantless arrest at home because police had probable cause to arrest him). See also *Roberts v. State*, 252 Ga. 227, 228 (314 SE2d 83) (1984) (stating that where arrest was supported by probable cause, "even if the arrest warrant was invalid, the arrest was nonetheless legal"). Thus, the critical question is whether there was probable cause to arrest Appellant on September 28, 2012.

At the time of Appellant's arrest, the police knew that Hunt had been killed; that her naked body had been found in the woods wrapped in black trash bags and duct tape; that she had been living with Appellant in the months leading up to her death and wanted to leave him but was scared for her life because he had threatened her; that Appellant had lied to the police about being in a relationship with Hunt and the last time he saw her; and that saliva containing Appellant's DNA had been found on Hunt's chest. These facts and circumstances were sufficient to warrant a prudent person to believe that Appellant had murdered Hunt and therefore to support a finding of probable cause. See *Beck v. Ohio*, 379 U.S. 89, 91 (85 SCt 223, 13 LE2d 142) (1964) (describing probable cause to make arrest).

12

Thus, regardless of any deficiency in the July 30, 2012 arrest warrant, the Fourth Amendment did not require the suppression of Appellant's post-arrest interview on September 28, 2012. Accordingly, this enumeration of error also lacks merit.[3]

*Judgment affirmed. Melton, C.J., Nahmias, P.J., and Peterson, Warren, Bethel, Ellington, and McMillian, JJ., concur.*

---

[3] Appellant asserts that suppression was required by both the Fourth Amendment and Article I, Section I, Paragraph XIII of the Georgia Constitution. However, he makes no argument that Paragraph XIII provides greater protection than the Fourth Amendment in this context. See *White,* 307 Ga. at 602 n.2.