S05A1315. THE STATE v. NASH.

(619 SE2d 684)

BENHAM, Justice.

Appellee Chadrick D. Nash was arrested on October 30, 2004, in connection with the shooting death of Leon Williams which had occurred earlier that day. At 11:35 p.m., Nash was interviewed by an agent of the Georgia Bureau of Investigation and a lieutenant/investigator of the police department of Cairo, Georgia, and made several inculpatory statements. Following his indictment for malice murder, felony murder, and possession of a firearm during the commission of a crime, Nash filed a motion to suppress the custodial statement he had made to the GBI agent and police official the night of his arrest. In lieu of holding a hearing on the motion, the State and appellee agreed to have the trial court view the videotape of the custodial interview. After doing so, the trial court granted the motion to

---

[16] *Burger v. State*, 245 Ga. 458, 459 (265 SE2d 796) (1980).

suppress, ruling that the investigators did not terminate the interview upon Nash's invocation of his Fifth Amendment right to remain silent and his Sixth Amendment right to have counsel present.

The trial court found that Nash, wearing a prison uniform and handcuffs when he was interviewed by the GBI agent and the police official, was in custody when he was questioned, was informed of his rights pursuant to *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966), stated he understood his rights and initialed a form indicating he understood his rights, but declined to sign a form waiving his rights. The trial court found that appellee, when asked whether he wanted to talk without an attorney present, said, "No," and clearly shook his head in the negative when the GBI agent asked, "You don't want to talk about it?" The trial court ruled the interview should have been terminated immediately when Nash told the investigators that he did not wish to talk without an attorney present and invoked his right to remain silent. Instead, as reflected in the videotape and the transcript thereof, stipulated as accurate by Nash and the State, the GBI agent said, "There'll be some small talk. We'll talk about, you know, your mama and what's going on in Cairo, if that's what you're talking about. . . . I'm going to . . . put refused to talk [on the waiver of rights form]." The GBI agent then proceeded to ask Nash a series of questions[1] which culminated in Nash saying, "You can talk to me now," and giving an inculpatory statement. In its order, the trial court described the conversation that followed Nash's invocation of his constitutional rights as "a subtle subterfuge . . . intended to eventually coerce or cajole [Nash] into giving a statement despite his having invoked his rights to counsel and to remain silent" which the trial court equated with " 'words or actions on the part of the police' which were the 'functional equivalent' of custodial questioning — words or actions the officer knew were reasonably likely to evoke an incriminating response from a suspect." See *Rhode Island v. Innis*, 446 U. S. 291, 300-301 (100 SC 1682, 64 LE2d 297) (1980) (where the

---

[1] The agent then asked Nash the number, gender, age, and location of any children he had; where Nash was born; his hair color, height, and weight; the state of his teeth; the source and descriptions of the tattoos covering Nash's arms, chest, and back; his facial hair; the status of his driver's license; his marital status; his father's name; and whether he had siblings. He then told Nash he would be returned to the sheriff's office after Nash signed a sheet containing the information the agent had obtained. The agent then said "That's the picture your mama gave us when we were looking for you. You did turn yourself in, though? I want to make that part of the record. You did turn yourself in." Nash responded, "Yeah, I could have ran," and the agent noted Nash had a number of places to which he could have gone had he run. Nash then alluded to reasons why altercations happen, and the agent said, "That's why I wanted to talk to you. That's why I wanted to talk to you." Nash responded, "You can talk to me. I told you, you can talk to me now." Nash noted that statements can be harmful, and the agent told him officers had only one side of the story after talking to a number of persons. Nash then said he wanted the agent and lieutenant to listen to him.

U. S. Supreme Court defined interrogation which must be preceded by *Miranda* warnings as the express questioning of a person in custody or "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect . . ."). Based on its findings of fact and legal conclusions, the trial court granted the motion to suppress. The State filed an appeal from that ruling.

1. The State's appeal is proper under OCGA § 5-7-1 (a) (4), which authorizes the State to file a direct appeal from a pretrial order sustaining a motion to suppress evidence illegally seized. See *State v. Henderson*, 271 Ga. 264 (517 SE2d 61) (1999).

2. The State contends the trial court erred in suppressing the inculpatory statement because Nash did not invoke his rights to remain silent and to counsel and, even if he did, routine police questioning not related to the case following the invocation of rights is not "custodial interrogation" within the meaning of *Miranda v. Arizona*, supra. When an appellate court reviews a trial court's grant or denial of a motion to suppress, the trial court's findings as to disputed facts will be upheld unless clearly erroneous and the trial court's application of the law to undisputed facts is subject to de novo review. *State v. Ray*, 272 Ga. 450 (2) (531 SE2d 705) (2000).

The State argues appellee never invoked his Sixth Amendment right to counsel since he never requested the presence of an attorney, and did not invoke his Fifth Amendment right to remain silent because the State construes appellee's negative response as "not a refusal to talk but instead is defendant's attempt to explain to [the GBI agent] that he prefers to talk off the record." However, the trial court found appellee invoked his right to remain silent at a different point in the questioning — when the videotape showed appellee "clearly *shook his head in the negative*" (emphasis in trial court's order) in response to the GBI agent's clarifying query, "Chad, so you don't want to talk about it?" which followed appellee's statement that he wanted "to just sit back and . . . get his charges . . . and just go back." In addition to the videotape, the agent's decision to write "refused to talk" on the waiver of rights form supports the trial court's finding that appellee invoked his right to remain silent. Since the videotape shows the trial court correctly noted appellee shook his head in the negative when asked if he wanted to talk about the victim's death and the questioning agent took appellee's response to be a refusal to talk about the incident, the trial court's finding that appellee invoked his right to remain silent is supported by evidence and therefore is not clearly erroneous.

3. The second issue for review is the admissibility of the statements made by appellee following his invocation of his right to remain

silent. "A person being subjected to custodial interrogation may at any time express his or her desire to remain silent and, thereby, end the interrogation. Any exercise of this right to silence must be 'scrupulously honored.' *Michigan v. Mosley*, 423 U. S. 96, 103 (96 SC 321, 46 LE2d 313) (1975)." *Green v. State*, 275 Ga. 569, 571-572 (2) (570 SE2d 207) (2002). When a defendant objects to the admission of statements he made during a police custodial interrogation, the burden is on the State to prove by a preponderance of the evidence that the statement was voluntary and was preceded by the defendant's knowing and voluntary waiver of his *Miranda* rights. *English v. State*, 260 Ga. App. 620 (2) (580 SE2d 351) (2003). "The Fifth Amendment requires the exclusion of any statement made by an accused during custodial interrogation, unless he has been advised of his right and has voluntarily waived those rights. [Cit.]" *Franks v. State*, 268 Ga. 238, 239 (486 SE2d 594) (1997).

The State maintains Nash's responses did not stem from custodial interrogation to which *Miranda* applies, but were to " 'routine police "questioning" not related to the investigation of the case nor designed, expected or likely to elicit information relevant to guilt. . . .' [Cit.]" *Jenkins v. State*, 123 Ga. App. 822, 824 (182 SE2d 542) (1971). A plurality of the U. S. Supreme Court has recognized as an exemption from *Miranda*'s coverage an accused's answers to "routine booking question[s] . . . to secure the 'biographical data necessary to complete booking or pretrial services.' " *Pennsylvania v. Muniz*, 496 U. S. 582, 601 (110 SC 2638, 110 LE2d 528) (1990). As we observed in *Franks v. State*, supra, 268 Ga. at 239-240,

> Georgia courts have confined the booking exception to requests for basic biographical data such as the suspect's name, age, address, educational background, marital status, and other information required to complete an arrest form. . . . Like most federal and state courts, we are unwilling to create a broad exception to the Fifth Amendment for police questions asked during booking "without investigative intent" or pursuant to "administrative procedure" once an accused has invoked his rights.

Pretermitting a question-by-question review to determine whether the GBI agent's myriad inquiries[2] did or did not request "basic biographical data essential to the booking process" (see *Franks v. State*, supra, 268 Ga. at 240, which requires scrutiny of such questions on a case-by-case basis), is our determination that the agent's

---

[2] See footnote 1, supra, for the substance of the agent's questions.

question concerning whether Nash had turned himself in is not a routine booking question to secure the necessary biographical data for arrest records. Id. Instead, it was the point at which Nash, after being urged to tell his side of the story, began to relate the interaction he had with the victim which led to the victim's death. Inasmuch as questions concerning how a suspect came to be in police custody are likely to elicit an incriminating response, they are not exempt from *Miranda* as questions seeking routine biographical data for booking purposes. See *Franks*, supra, 268 Ga. at 240. Accordingly, the trial court did not err when it suppressed the statements made by Nash following his invocation of his Fifth Amendment right to remain silent.[3]

4. Since the trial court correctly ruled that any inculpatory statement made by Nash had to be suppressed since it was made in violation of Nash's Fifth Amendment right to remain silent, it is not necessary for this Court to address whether the trial court was correct in its determination that the inculpatory statement was obtained in violation of Nash's Sixth Amendment right to counsel.

5. In its order granting the motion to suppress, the trial court noted that a statement made by the GBI agent "could well be considered to have run afoul of OCGA § 24-3-50 [as a hope of benefit]." On appeal, the State takes issue with the evidentiary basis for such a finding. Since the trial court's suppression of the statement is upheld due to the failure to terminate the interview upon Nash's invocation of his right to remain silent, and we view the trial court's remark as an observation rather than a factual finding upon which it based its ruling, we do not address the State's contention.

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 19, 2005.

*Joseph K. Mulholland, District Attorney, Charles M. Stines, Assistant District Attorney*, for appellant.

*Ernie M. Sheffield, James C. Bonner, Jr., Sarah L. Gerwig-Moore,* for appellee.

---

[3] We note further that the appellate record does not contain the sheet of paper on which the GBI agent recorded the information obtained by the questions asked of Nash following his invocation of his right to remain silent. Since Nash was already in prison clothing when questioned and the GBI agent noted Nash was to be returned to the custody of the sheriff at the conclusion of the interview, it is likely Nash had been through the booking procedure prior to the interview at issue, making it unclear what paperwork the agent was generating.