304 Ga. 460
FINAL COPY

S18A0933. DAVIDSON v. THE STATE.
S18A0934. GRANT v. THE STATE.

BLACKWELL, Justice.

Richard Davidson and Michael Denay Grant were tried separately by Fulton County juries, and both were convicted of murder and the unlawful possession of a firearm during the commission of a felony in connection with the attempted robbery and fatal shooting of Christopher Walker. Davidson and Grant appeal, each asserting that the trial court erred when it admitted certain evidence at his trial. We find no harmful error with respect to Davidson. We conclude, however, that the trial court erred when it admitted a statement against Grant that law enforcement officers elicited from him in a custodial interrogation after he unequivocally invoked his constitutional right to remain silent, and the State has failed to show that this error was harmless beyond a

reasonable doubt. Accordingly, we affirm in Davidson's case, and we reverse in Grant's.[1]

*Sufficiency of the Evidence as to both Davidson and Grant*

1. Viewed in the light most favorable to the verdicts, evidence presented at both trials shows that Walker and a friend, Alberto Rodriguez, went to a Taco Bell restaurant in Alpharetta early on the evening of March 12, 2013. As they

---

[1] Walker was killed in March 2013. Three months later, a Fulton County grand jury indicted Davidson, Grant, and Matthew Goins, charging them with three counts of murder in the commission of a felony and one count of murder with malice aforethought, aggravated assault, attempted armed robbery, and the unlawful possession of a firearm during the commission of a felony. Davidson was also charged with possession of a firearm by a convicted felon. Davidson was tried alone by a jury in October 2014, and that same month, Grant and Goins were tried together by a different jury. At Davidson's trial, the jury found him guilty on all counts, and he was sentenced to imprisonment for life without the possibility of parole for malice murder and a consecutive term of five years for unlawful possession of a firearm during the commission of a felony. At Grant's trial, the jury acquitted him of malice murder, but found him guilty of felony murder and the other charges. (The same jury acquitted Goins on all counts.) Grant was sentenced to imprisonment for life for felony murder and a consecutive term of five years for unlawful possession of a firearm during the commission of a felony. In both cases, the other counts as to which Davidson and Grant were found guilty were merged or vacated by operation of law, see Malcolm v. State, 263 Ga. 369, 371-373 (4), (5) (434 SE2d 479) (1993), and no party raises any claim of error with respect to the merger or vacation of counts on which Davidson and Grant were not sentenced. See Hood v. State, 303 Ga. 420, 425 (1) (d) (811 SE2d 392) (2018). Davidson filed a motion for new trial in November 2014, he amended his motion in June 2015, and after a hearing, the trial court denied his motion in November 2015. Grant also filed a motion for new trial in November 2014, and he amended it in January 2016. After a hearing, the trial court likewise denied Grant's motion in February 2017, and the trial court amended its denial in May 2017. Davidson and Grant both timely filed notices of appeal, and their respective appeals were docketed to the April 2018 term of this Court. Davidson's appeal was submitted on the briefs, and Grant's appeal was orally argued on August 6, 2018.

2

entered the restaurant, they saw two men standing outside. Rodriguez noticed that one of these men had dreadlocks and appeared to be staring at Walker's gold chain, and the other man was wearing a striped shirt. Walker and Rodriguez were inside the restaurant for approximately 13 minutes, and when they left, Rodriguez saw the same man with dreadlocks, now seated in a car that was parked in a lot across the street from the Taco Bell and in the company of two other men. Walker and Rodriguez then drove about six miles to Walker's house in Milton, unaware that they were being followed. They parked in Walker's driveway, and as they exited their car, they were approached by the man in a striped shirt, who asked them where he could get some marijuana. When they responded that they did not know, the man started to walk away. But he quickly turned and approached them again, commenting that he liked the chain that Walker was wearing. The man in the striped shirt then pulled out a gun and demanded the chain. When Walker refused, Walker and the man struggled, the man held a gun to Walker's head, and eventually, the man shot Walker in the head. The man then fled to a nearby car — the same car that Rodriguez had observed earlier in the lot across the street from the Taco Bell — which sped away from the scene. Later that night, Walker died as a result of the

gunshot wound to his head. An autopsy led to the recovery of bullet fragments, which indicated that Walker had been shot with a .40-caliber bullet.

Investigators retrieved a recording from the video surveillance system at the Taco Bell, and they took notice of three men depicted in the recording, who visited the restaurant close in time to Walker and Rodriguez. When investigators showed the recording to Rodriguez, he identified one of these men as the man with dreadlocks whom he had seen staring at Walker's gold chain, and he identified another as the man in the striped shirt who shot Walker. Investigators also showed the recording to one of Walker's neighbors, and the neighbor said that she had seen the man in the striped shirt run through her yard with a handgun around the time of the shooting. Investigators then released the recording to the public and asked for information about the three men depicted in the recording. Danielle Weed responded to this request for information, and she told investigators that she personally knew all three men. She identified the man with dreadlocks as Matthew Goins; she said that the man in the striped shirt was Davidson; and she identified the third man as Grant. At the trials, Weed again identified Goins, Davidson, and Grant in the video recording, and

4

Rodriguez testified that Grant's car was the car that he had observed both at the Taco Bell and in Walker's neighborhood.

At his trial, Davidson disputed that he was present at the scene of the shooting. The prosecution offered evidence (under OCGA § 24-4-404 (b)) that Davidson had robbed a traveling businessman at gunpoint only a few months before Walker was killed. In addition, the prosecution presented evidence that investigators had searched Davidson's home, where they found .40-caliber ammunition, although a firearms examiner testified that he was unable to determine whether the .40-caliber ammunition was of the same brand as the bullet that killed Walker. The prosecution also presented evidence of a statement made by Goins, in which Goins admitted that he was present at the scene of a killing. Goins, however, said nothing in that statement about Davidson.

Grant did not dispute at his joint trial with Goins that he was present at the scene of the shooting, but Grant argued that he was not a party to the attempted robbery or killing. The prosecution presented evidence that, after Grant was arrested, he made a purportedly incriminating statement to investigators. In that statement, Grant attempted to exonerate Goins, saying that Goins "didn't know

we was doing none of that; he didn't know we was going to do that; he didn't know we planned on doing nothing; he was just trying to get home."

Only Grant asserts on appeal that the evidence is legally insufficient to sustain his convictions, but it is our customary practice to review the sufficiency of the evidence in all murder cases, and so, we will consider the sufficiency of the evidence as to Davidson as well. We have separately reviewed the records of Davidson's and Grant's respective trials. We conclude that the evidence presented against Davidson is legally sufficient to authorize a rational jury to find beyond a reasonable doubt that he is guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). And although the case against Grant is considerably weaker, we conclude that the evidence presented at his trial also is legally sufficient to authorize a rational jury to find beyond a reasonable doubt that Grant is guilty of the crimes of which he was convicted. See id. See also Cowart v. State, 294 Ga. 333, 343-344 (6) (751 SE2d 399) (2013) (when we assess the legal sufficiency of the evidence under Jackson, we consider all of the evidence presented at trial, even evidence that might have been admitted erroneously).

6

*Davidson's Claims of Error*

2. Davidson claims that the trial court erred when it admitted evidence of the .40-caliber ammunition that was found in his home. Davidson argues that the ammunition was not shown to be connected with Walker's shooting, and the prejudicial impact of the evidence, therefore, substantially outweighed its probative value, rendering it inadmissible under OCGA § 24-4-403.[2] We disagree. The probative value of this evidence may have been limited, but the prejudicial impact was limited too. When the evidence was presented, Davidson elicited testimony on cross-examination that investigators also found a .40-caliber handgun in his home, which was excluded as the murder weapon by a subsequent firearms examination. The testimony conveyed clearly to the jury that the .40-caliber handgun found in the Davidson home was *not* the murder weapon, and the presence of the .40-caliber handgun offered an innocent explanation for the presence of the .40-caliber ammunition. In addition, the testimony clearly conveyed that the connection between the ammunition found in the home and the bullet with which Walker was shot was tenuous, if there

---

[2] Rule 403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." OCGA § 24-4-403. Davidson does not argue that the ammunition was *irrelevant* to his guilt.

7

were any connection at all. Moreover, the other evidence against Davidson was quite strong. The video recording from the Taco Bell and the testimony of Rodriguez, Walker's neighbor, and (especially) Weed identified Davidson as the man who shot Walker. In this light, we cannot say that the probative value of the ammunition was so substantially outweighed by the danger of unfair prejudice that the trial court abused its discretion when it admitted the evidence. See Olds v. State, 299 Ga. 65, 70 (2) (786 SE2d 633) (2016) ("[T]he exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly." (citation and punctuation omitted)).

3. Davidson also contends that the trial court erred when it admitted Goins's statement. Weed testified at trial that, after she first saw the video recording from the Taco Bell that investigators had released to the public, she confronted Goins about it. The prosecuting attorney asked Weed how Goins responded, and Weed testified that "[Goins] said that somebody was killed and he was in the car, he was in the back seat, but he didn't want to talk about what happened." The trial court admitted this evidence as the statement of a co-conspirator under OCGA § 24-8-801 (d) (2) (E). Davidson argues on appeal that the evidence was inadmissible under Rule 801 (d) (2) (E) because the

8

prosecution failed to establish a conspiracy, and in any event, the prosecution failed to show that the statement was made "in furtherance of" the conspiracy.[3]

We need not decide, however, whether the admission of this evidence was error because, even if it were, any error was harmless and would not warrant a reversal. See Perez v. State, 303 Ga. 188, 190-191 (2) (811 SE2d 331) (2018). Goins's statement did not mention Davidson — it only indicated that Goins himself was in the back seat of a car when someone was killed. To the extent that this statement put Davidson at the scene of the crime, it did so only by

---

[3] Davidson also argues on appeal that the evidence of Goins's statement violated the Confrontation Clause and that the trial court erroneously failed to charge the jury that it was responsible for determining whether a conspiracy existed before it could consider the statement against Davidson. Neither of these arguments, however, merits much discussion. The statement was not testimonial — Davidson does not even argue that it was — and evidence of the statement does not, therefore, implicate the Confrontation Clause. See McClendon v. State, 299 Ga. 611, 618 (4) (b) (791 SE2d 69) (2016) ("[T]he question of whether hearsay evidence violates the Confrontation Clause turns . . . on whether the hearsay statement is testimonial."). See also Pitts v. State, 280 Ga. 288, 288-289 (627 SE2d 17) (2006) (describing a testimonial statement as a "formal statement to a government officer made in an effort to establish an evidentiary case" or a "[statement] made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial" (citation and punctuation omitted)). About the jury charge, Davidson never asked for such a charge, and so, the failure of the trial court to give the charge is reviewable only for plain error. See Nalls v. State, 304 Ga. 168, 172 (2) (a) (815 SE2d 38) (2018). Plain error cannot be established here because, as we will explain later in Division 3, the statement itself was harmless, and it follows that the lack of an instruction limiting the use of the statement likewise could not have caused any prejudice. See Saffold v. State, 298 Ga. 643, 648 (3) (b) (784 SE2d 365) (2016) (an erroneous limiting instruction does not warrant reversal where the underlying evidence was harmless).

inference, and only when coupled with Weed's testimony about the identity of the men depicted in the video recording from the Taco Bell. Put another way, Goins's statement implicated Davidson only if the jury credited Weed's testimony that the video recording depicted both Davidson and Goins. But Weed's testimony, in combination with the testimony of Rodriguez and Walker's neighbor, established Davidson's presence at the scene of the crime independent of Goins's statement, and much more directly besides. As a result, Goins's statement was not only cumulative of other, more probative evidence, but it did not implicate Davidson unless combined with that other evidence. We are unconvinced that any error in the admission of Goins's statement had an effect on the outcome of the trial.[4] See id. at 191 (2) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error

---

[4] Davidson also argues that he was denied the effective assistance of counsel when his trial lawyer objected to the statement on the ground that the prosecution had failed to establish a conspiracy, but failed to object on the ground that the statement was not "in furtherance of" any conspiracy. See generally Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). Given our conclusion that the admission of the statement was harmless, Davidson cannot establish that the failure of his lawyer to offer additional grounds for the objection to the statement was prejudicial, and his claim of ineffective assistance, therefore, fails. See Stroud v. State, 301 Ga. 807, 813 (III) (804 SE2d 418) (2017) (where error in admitting evidence was harmless, failure of lawyer to object to that evidence is not prejudicial under Strickland).

10

did not contribute to the verdict." (citation and punctuation omitted)). See also Wright v. State, 291 Ga. 869, 872 (3) (a) (734 SE2d 876) (2012) (erroneous admission of hearsay evidence may be harmless if it is merely cumulative of other properly-admitted evidence).

*Grant's Claim of Error*

4. Grant contends that the trial court erred when it admitted the statement in which he attempted to exonerate Goins, arguably incriminating himself along the way. That statement was the product of a custodial interrogation, and prior to trial, Grant filed a motion to suppress it, asserting that he repeatedly and unequivocally invoked his right to remain silent before giving the statement, but the investigators nonetheless pressed forward with their interrogation. Following a pretrial hearing, the trial court denied the motion, reasoning that Grant's repeated invocations of the right to remain silent were equivocal and ineffectual because Grant attempted to invoke the right before he was advised of his rights under Miranda v. Arizona, 384 U. S. 436, 473-474 (III) (86 SCt 1602, 16 LE2d 694) (1966). The trial court should have granted the motion to suppress, and the admission of the statement was error that requires us to reverse Grant's convictions.

11

The record[5] shows that, shortly after he was arrested, Grant was taken to a police station, where he was placed in an interview room. There, two investigators attempted to question Grant, who remained handcuffed throughout. After the investigators collected some identification information from Grant, this exchange occurred:

> OFFICER: [W]hat do you think this is about?
> GRANT:　 I prefer you guys to tell me what this is about.
> OFFICER: Well, before we can do that, since you're . . . handcuffed and we're interviewing you in an interview room at the police department, we're required to read your Miranda rights. Do you know what those are?
> GRANT:　 Yes, sir.
> OFFICER: Do you want to waive your Miranda rights and let us tell you what this is about?
> GRANT:　 Do I want to waive my rights? No.
> OFFICER: You don't? So you don't want to know what it's about?
> GRANT:　 I'm not waiving nothing.
> OFFICER: So you don't — you don't want us to tell you?
> GRANT:　 Not if it causes me to give up my rights, no.
> OFFICER: You don't want to talk about this at all?
> GRANT:　 Uh-uh [shaking head to indicate "no"]
> OFFICER: It's the only way we can talk to you is if you waive your Miranda rights. And if there's a question you don't want to answer, you just say — you can just say you don't want to answer it.
> GRANT:　 Am I under arrest?
> OFFICER: Uh-huh [nodding head to indicate "yes"]

---

[5] The record includes a video recording of the interrogation.

12

GRANT:   Then I don't got nothing to say.

Following this exchange, the investigators continued to implore Grant to speak with them, and they then stepped out of the room for a few minutes. When they returned, they read the Miranda warnings to Grant. In response to the Miranda warnings, Grant said: "If I'm already under arrest, then I've got nothing to say about nothing." Grant then nonetheless signed an acknowledgment and waiver of his rights, and the investigators proceeded to question him about Walker's shooting. Although Grant answered some of their questions, he said nothing incriminating. After several minutes, Grant refused to answer further questions:

GRANT:   I ain't got nothing to say.
OFFICER: Just get it done. Just tell it. Get it over with.
GRANT:   It's over with already.
OFFICER: No, it ain't.
GRANT:   I don't got nothing to say.

At that point, Grant stood and indicated that he was ready to be transported to the jail. One investigator then left the room, and Grant said to the other investigator: "If it wasn't for him, I probably would have said something to you." The remaining investigator then asked if Grant would speak with him alone, Grant sat down, and the interrogation resumed. In the course of the interrogation that followed, Grant made the statement at issue: "[Goins] didn't

13

know we was doing none of that; he didn't know we was going to do that; he didn't know we planned on doing nothing; he was just trying to get home . . . ."

From our review of the record, it seems clear that Grant invoked his constitutional right to remain silent early and often in the interview, but the investigators repeatedly disregarded those invocations and pressed forward with their efforts to elicit a statement from Grant. To be sure, several (but not all) of those invocations preceded the reading of the <u>Miranda</u> warnings. The State argued in the trial court — and continues to argue on appeal — that any invocations that precede the reading of <u>Miranda</u> warnings are ineffectual. The trial court found that argument persuasive. We do not.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself,"[6] and so, no person ever can be compelled by law enforcement officers to make a testimonial statement in which he incriminates himself. See generally <u>Hiibel v. Sixth Judicial Dist. Court of Nev.</u>, 542 U. S. 177, 189-190 (IV) (124 SCt 2451, 159 LE2d 292) (2004) (discussing scope of privilege against self-incrimination). The right to remain

---

[6] Our state Constitution also guarantees a privilege against self-incrimination: "No person shall be compelled to give testimony tending in any manner to be self-incriminating." Ga. Const. of 1983, Art. I, Sec. I, Par. XVI.

14

silent that is described in the <u>Miranda</u> warnings derives from the Fifth Amendment itself, not the decision in <u>Miranda</u>.[7] A person in the custody of law enforcement officers has a constitutional right to remain silent in response to their questions, regardless of whether he fully understands that right or has been advised of it under <u>Miranda</u>. See <u>State v. Collins</u>, 363 NW2d 229, 233-234 (Wis. App. 1984). Cf. <u>McNeil v. Wisconsin</u>, 501 U. S. 171, 182 (II), n.3 (111 SCt 2204, 115 LE2d 158) (1991) ("We have in fact never held that a person can invoke his <u>Miranda</u> rights anticipatorily, *in a context other than 'custodial interrogation.'*" (emphasis supplied)). He always may, of course, elect to share information with law enforcement, but it must be his voluntary choice to do so. See <u>Miranda</u>, 384 U. S. at 478 (III) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). See also <u>Wan v. United States</u>, 266 U. S. 1, 14-15 (45 SCt 1, 69 LE 131) (1924) ("A confession is voluntary in law if, and only if, it was, in fact, voluntarily made. . . . But a confession obtained by compulsion must be excluded whatever may

---

[7] Indeed, almost 70 years before <u>Miranda</u>, the United States Supreme Court recognized that the constitutional privilege against self-incrimination applies with respect to a confession elicited in a custodial interrogation. See <u>Bram v. United States</u>, 168 U. S. 532, 542 (18 SCt 183, 42 LE 568) (1897).

15

have been the character of the compulsion, and whether the compulsion was applied in a judicial proceeding or otherwise." (citation omitted)). Recognizing that compulsion is inherent to some extent whenever a suspect is in the custody of those putting questions to him, the United States Supreme Court in Miranda adopted a prophylactic rule that, before a suspect in custody can be questioned, he must be advised of certain constitutional rights, including the right to remain silent. Miranda, 384 U. S. at 467-468 (III). Nothing in Miranda suggests, however, that the right to remain silent in response to a custodial interrogation attaches only if, and when, law enforcement officers have read the Miranda warnings. See Collins, 363 NW2d at 233. See also United States v. Bushyhead, 270 F3d 905, 911 (III) (9th Cir. 2001).

The law is clear that, when a person in the custody of law enforcement officers unambiguously and unequivocally invokes his right to remain silent in connection with their interrogation, the interrogation must cease immediately. See Miranda, 384 U. S. at 473-474 (III). Whether an invocation is unambiguous and unequivocal "depends on whether the accused articulated a desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to

16

remain silent." <u>Rogers v. State</u>, 290 Ga. 401, 404 (2) (721 SE2d 864) (2012) (citations and punctuation omitted), disapproved on other grounds by <u>State v. Sims</u>, 296 Ga. 465 (769 SE2d 62) (2015). Here, at the outset of the interview, the investigators brought up the subject of "<u>Miranda</u> rights." Immediately, Grant said that he knew about his "<u>Miranda</u> rights," that he did not want to waive those rights, that he did not want "to talk about this at all," and that he had "nothing to say." When the investigators finally got around to reading the <u>Miranda</u> warnings to Grant, his response was: "If I'm already under arrest, then I've got nothing to say about nothing." The investigators nevertheless pressed forward with their interview. Grant yielded to a few questions and then again announced that "I ain't got nothing to say. . . . I don't got nothing to say." No reasonable officer could have understood these repeated statements as anything other than clear assertions of the right to remain silent.[8] See, e.g., <u>Mack v. State</u>, 296 Ga. 239, 243 (1) (765 SE2d 896) (2014) ("I'm done. I have no more to say. I'm done" was unequivocal invocation of right to remain silent); <u>State v. Moon</u>,

---

[8] We note that, in this case, not only would a reasonable police officer have understood Grant to have invoked his right to remain silent, but the record shows that the police officers conducting the custodial interrogation of Grant actually understood that he had done so yet continued to badger him to change his mind.

17

285 Ga. 55, 57 (673 SE2d 255) (2009) ("I ain't got no more to say. I mean, that is it" was unequivocal invocation); State v. Nash, 279 Ga. 646, 648 (2) (619 SE2d 684) (2005) (shaking of head to indicate "no" in response to question about whether suspect wanted to talk with police was unequivocal invocation); Green v. State, 275 Ga. 569, 573 (2) (570 SE2d 207) (2002) ("I don't want to talk" was unequivocal invocation). The custodial interrogation should have ceased at the point of these unequivocal invocations of the right to remain silent, well before Grant agreed to speak with one investigator alone and made the arguably incriminating statement now at issue.[9] See Green, 275 Ga. at 571-572

---

[9] On appeal, the prosecution has continued to urge (as it did in the trial court) that the investigators were not obligated to respect the invocations of the right to remain silent until they had satisfied themselves that Grant understood those rights, and they could satisfy themselves only by reading the Miranda warnings. To begin, it was the investigators who first made reference to "Miranda," Grant unequivocally said that he understood his "Miranda rights" in response to that reference and prior to the reading of the Miranda warnings, and he said nothing that gave reason to doubt that he understood the nature of his right to remain silent. Nor is it surprising that an ordinary citizen might know of his "Miranda rights" prior to the reading of Miranda warnings; the warnings are now deeply ingrained in our popular culture, and virtually anyone who has watched more than a couple of episodes of Law & Order could probably recite the Miranda warnings. More important, however, the Miranda warnings are a shield for persons in police custody; they cannot be interrogated until they have been advised of their rights and have then voluntarily relinquished them. The warnings are not a sword for the police, a means for police to deny the right of a citizen to remain silent — a right that exists independent of the Miranda decision and is secured by the Fifth Amendment itself (and the Georgia Constitution) — by withholding the warnings until the consistent disregard of repeated invocations of the right has broken the will to resist interrogation. And in any event, Grant *again* unequivocally invoked the right to remain silent *after* the Miranda warnings were read. The position of the prosecution is baseless.

18

(2). The statement that was elicited thereafter should have been suppressed, and the admission of that statement was error.[10]

Even so, the prosecution argues that any error in admitting the statement at issue was harmless. Although "the error is one of constitutional magnitude, it can be harmless error if the State can prove beyond a reasonable doubt that the

_____

In this regard, we also remind prosecuting attorneys of their solemn obligation to seek justice in every case. See Berger v. United States, 295 U. S. 78, 84-88 (2) (55 SCt 629, 79 LE 1314) (1935). Sometimes, when a trial court has clearly gotten it wrong (even when it was the prosecution that originally led the trial court into that error), seeking justice on appeal means conceding the obvious error, and in those instances, that is the duty of the Attorney General and the district attorney. "[The offices of prosecuting attorneys] are of such independence and importance that while you are being diligent, strict, and vigorous in law enforcement you can also afford to be just. Although the government technically loses its case, it has really won if justice has been done." Robert H. Jackson, Address to the Second Annual Conference of United States Attorneys: "The Federal Prosecutor" (Apr. 1, 1940).

[10] In its briefs, the State urges that, even if the investigators failed early in the interview to scrupulously honor Grant's invocations of his right to remain silent, his statements near the end of the interview are nonetheless admissible because Grant voluntarily reinitiated the interview after one investigator left the room. Although it is possible for a suspect who has previously invoked his right to remain silent to reinitiate contact with law enforcement, interrogation of such a suspect is permissible "only if the renewed contact by the suspect was not the product of past police interrogation conducted in violation of the suspect's previously-invoked rights." Mack v. State, 296 Ga. 239, 248 (2) (b) (765 SE2d 896) (2014). "In determining the causal connection between the prior unlawful interrogation and the suspect's renewal of contact, the entire sequence of events leading up to the suspect's renewal of contact must be considered." Id. Here, we have reviewed "the entire sequence of events" preceding Grant's statement to the remaining officer and his submission to continued questioning and find that the prior, unlawful conduct of the police officers "fatally tainted the spontaneity of [Grant's] subsequent statement, making it . . . the product of inducement, provocation, or subtle coercion." Id. at 247-248 (2) (b) (citation and punctuation omitted).

19

error did not contribute to the verdict, such as when the evidence at issue is cumulative of other properly-admitted evidence or when the evidence against the defendant is overwhelming." Brown v. State, 288 Ga. 404, 408 (3) (703 SE2d 624) (2010). Here, the case against Grant was, although legally sufficient, not strong. There was evidence putting Grant in the company of Davidson, the shooter, at the Taco Bell, and some evidence that he accompanied Davidson to the scene of the shooting. But mere presence is not enough to prove guilt, see Stewart v. State, 299 Ga. 622, 627 (2) (c) (791 SE2d 61) (2016), and apart from his arguably incriminating (and erroneously admitted) statement, there was little evidence to suggest that Grant was a voluntary participant or accomplice in the crimes. Indeed, perhaps in an acknowledgment of their weak case, the prosecuting attorneys pointed to the statement at issue repeatedly in their closing arguments, telling the jury that Grant's use of the word "we" when describing what Davidson had done was proof that Davidson and Grant shared a common criminal intent and did those things together. Moreover, soon after the jury began its deliberations, it sent a note to the court, asking to see again the video recording of Grant's statement and asking for a recharge on the concept of "parties to a crime." Finally, we note that Goins — whose culpability seemed

20

no more doubtful than Grant's, apart from Grant's statement exonerating Goins and arguably incriminating himself[11] — was acquitted of all charges by the same jury that found Grant guilty. The State has failed to prove beyond a reasonable doubt that the erroneous admission of Grant's custodial statement did not contribute to the guilty verdicts, and Grant is entitled to a new trial. See Benton v. State, 302 Ga. 570, 575 (2) (807 SE2d 450) (2017).

Judgment affirmed in Case No. S18A0933. Judgment reversed in Case No. S18A0934. Melton, C. J., Nahmias, P. J., Benham, Hunstein, Boggs, and Peterson, JJ., concur. Warren, J., not participating.

---

[11] Grant owned the car in which they followed Walker to his home, but no evidence was presented at trial that Grant was driving. And it was Goins — not Grant — whom Rodriguez identified as the man who appeared interested in Walker's gold chain at the Taco Bell, and whom Rodriguez identified as sitting in the car parked in a lot across the street from the Taco Bell when Rodriguez and Walker emerged from the Taco Bell some 13 minutes later.

Decided September 24, 2018.

Murder. Fulton Superior Court. Before Judge Adams.

Chaunda Brock, for appellant (case no. A18A0933).

Benjamin D. Goldberg, for appellant (case no. A18A0934).

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Arthur C. Walton, Teri B. Walker, Stephany J. Luttrell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew D. O'Brien, Assistant Attorney General, for appellee.