**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0290
Darrian McDaniel
v.
The State

On Appeal from the Superior Court of Fulton County
No. 17SC154106

Decided: June 16, 2026

LAND, Justice.

Darrian McDaniel challenges his 2022 convictions for malice murder and other crimes in connection with the shooting death of Thomas Entrekin.[1] McDaniel argues that his rights pursuant to *Miranda v. Arizona,* 384 US 436 (1966), were violated

---

[1] Entrekin was killed on or about January 9, 2016. On August 29, 2017, a Fulton County grand jury indicted McDaniel for murder (Count 1), felony murder predicated on armed robbery (Count 2), felony murder predicated on hijacking a motor vehicle (Count 3), felony murder predicated on aggravated assault with a deadly weapon (Count 4), felony murder predicated on possession of a firearm by a convicted felon (Count 5), armed robbery (Count 6), hijacking a motor vehicle (Count 7), aggravated assault with a deadly weapon (Count 8), concealing the death of another (Count 9), possession of a firearm during the commission of a felony (Count 10), and possession of a firearm by a convicted felon (Count 11).

At a trial from November 7 to 10, 2022, the jury found McDaniel guilty of all charges in the indictment. The trial court sentenced McDaniel to serve life in prison without the possibility of parole for Count 1, life in prison for Count 6 (to run concurrently with Count 1), 10 years to serve in prison for Count 7 (to run consecutive to Count 1), 10 years to serve in prison for Count

when he was questioned by officers on March 10, 2016, and that the trial court violated the rule of completeness by allowing only a portion of this interview to be played for the jury. For the reasons that follow, we affirm.

1. The evidence presented at trial showed as follows. On or about January 8, 2016, Entrekin, who lived in Blakely, purchased a tan Ford F-150 pickup truck and told friends that he was going to Atlanta to work on a home he owned in East Point. In late January, Entrekin's friends contacted police after repeatedly and unsuccessfully trying to get in touch with him. Police issued a BOLO ("be on the lookout") order for Entrekin and listed him as a missing person.

Meanwhile, in mid-January, McDaniel's family and friends saw him using a pickup truck in the Atlanta area. On or about January 9, McDaniel drove to a friend's house in a tan F-150 pickup truck. McDaniel "hand[ed] money out" to "several people" and gave the friend a credit card belonging to Entrekin. On the evening of January 9, the friend attempted to use Entrekin's credit card, but the purchase was declined and the friend left the

---

9 (to run consecutive to Count 1), 5 years to serve in prison for Count 10 (to run concurrently with Count 9), and 5 years to serve in prison Count 11 (to run concurrently with Count 10). The felony murder charges (Counts 2-5) were vacated by operation of law, and Count 8 merged with Count 1 for sentencing purposes.

On November 21, 2022, McDaniel filed a motion for new trial, which was amended by new counsel on December 20, 2024. The trial court held an evidentiary hearing on April 9, 2025, and entered a written order denying McDaniel's motion for new trial as amended on April 21, 2025. On April 22, 2025, McDaniel filed a notice of appeal directed to the Court of Appeals, which was amended on July 7, 2025. The Court of Appeals transferred the appeal to this Court on September 25, 2025. The case was docketed to this Court's term beginning in December 2025 and submitted for a decision on the briefs.

card at the store.

On the morning of February 5, 2016, Conyers police and Rockdale County officers responded to a call about a burglary at an apartment complex and a tan F-150 pickup truck that had left the area. An officer testified at trial that, on his way to the scene, he passed a tan F-150 pickup truck and determined that the pickup was registered to Entrekin. After the officer saw the person driving the truck commit a traffic infraction, he activated his patrol lights and attempted to make a traffic stop; the driver did not pull over and instead led the officer on a high-speed chase. Officers later found Entrekin's pickup truck crashed and unoccupied. They found McDaniel and the other occupants of the truck, Demetric Lawson and Damario Julian, nearby, arrested them for burglary, and brought them in for questioning.

McDaniel gave permission to officers to search his phone. That search revealed pictures and videos of McDaniel in Entrekin's pickup truck dating back to January 15, 2016. Officers also found bloodstains and a .45-caliber shell casing in the pickup truck.

On February 5, Captain Michael Vaughn with the Conyers Police Department interviewed McDaniel after he was arrested in connection with the Conyers burglary. Captain Vaughn provided McDaniel with *Miranda* warnings, and McDaniel acknowledged his rights and agreed to speak with Captain Vaughn. A copy of McDaniel's *Miranda* waiver from the February 5 interview was admitted into evidence at trial. Captain Vaughn testified that at the time of the interview, "the only thing that [he] knew about Mr. Entrekin was that the vehicle that was being driven [by McDaniel] during the police pursuit … was registered" to Entrekin. Shortly after the interview, investigators learned that Entrekin was listed as a missing person.

3

Police also interviewed Julian. A Conyers police officer testified that, during that interview, Julian gave information that indicated Entrekin had been murdered. Based on this information, officers took Julian to look for Entrekin's body on the evening of February 5, but did not find it.

While McDaniel was in custody at the Rockdale County jail, he told his cellmate that he was walking in Atlanta when he came upon a man outside of his truck, held him at gunpoint, "unloaded on him" and "emptied the clip" into him. McDaniel told the cellmate that he then left the man's body at a car wash, took his pickup truck and drove it for several hours, and returned to the car wash and placed the man's body in the truck's backseat. McDaniel told the cellmate that he took the man's money and credit cards, initially dumped the body in the woods, and then moved it again and hid it under a pile of trash. The inmate passed this information on to investigators, who discovered Entrekin's body outside a Fulton County residence in early March 2016.

After finding Entrekin's body, Captain Vaughn interviewed McDaniel again on March 10, 2016. GBI Agent Jastacia Cheeks joined the interview and reminded McDaniel of his *Miranda* rights approximately six minutes into the interview, and McDaniel agreed to speak with Agent Cheeks.[2] During the three hour interview, portions of which were played for the jury at trial, McDaniel initially told Cheeks and Vaughn that he found Entrekin's pickup truck idling at a gas station and stole it, but eventually admitted to holding Entrekin at gunpoint, shooting him repeatedly, and hiding his body.

The forensic pathologist who conducted Entrekin's autopsy

---

[2] It does not appear from the record that McDaniel signed a second waiver of his *Miranda* rights.

4

testified that Entrekin suffered eight gunshot wounds and died from those wounds. The forensic pathologist retrieved one of the bullets from Entrekin's body, and an expert in firearms with the GBI testified that the same firearm fired the shell casing recovered from Entrekin's pickup truck and the bullet recovered from his body.

2. McDaniel argues that the trial court erred in denying his motion to suppress his March 10, 2016, custodial interview because his *Miranda* rights were violated. Specifically, McDaniel argues that he "stated that he did not want to talk to law enforcement," at which point "*any* questioning should have immediately ceased, the Defendant advised of his *Miranda* rights, and counsel provided as requested." We disagree.

On July 3, 2021, McDaniel filed a motion to suppress "all of his statements given to police" on the ground that he did not knowingly and intelligently waive his *Miranda* rights "on all of the occasions he was interrogated by police." During the hearing on his motion to suppress, however, McDaniel conceded that the only statement at issue was the March 10, 2016, interview and focused on the first six minutes of that interview, which he argued was an interrogation in violation of his *Miranda* rights because he did not receive additional *Miranda* warnings.

When an appellate court reviews a trial court's ruling on a motion to suppress, "an appellate court must construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court." *Hughes v. State*, 296 Ga. 744, 746 (2015). When "some or all of the material facts are undisputed, we properly may take notice of the undisputed facts — even if the trial court did not — without interfering with the prerogative of the trial court to resolve disputes of material fact." *State v. Franklin*, 318 Ga. 39, 39 (2024) (citation and punctuation omitted).

"Such undisputed facts include, among other things, those which definitively can be ascertained exclusively by reference to evidence that is uncontradicted and presents no questions of credibility." Id. at 39 n.1 (cleaned up). Viewed in this way, the evidence presented at the hearing on McDaniel's motion to suppress, which consisted of the testimony of Captain Vaughn, Agent Cheeks, and the video-recordings of McDaniel's March 10, 2016, interview, shows the following.

On March 10, 2016, McDaniel was interviewed by Captain Vaughn, joined by Agent Cheeks. Upon entering the interview room, Agent Cheeks introduced himself, and Captain Vaughn began to explain why Agent Cheeks was there:

> CAPTAIN VAUGHN: Hey, Darrian, what's up. Man, we brought these guys in, since this investigation's led us all over the place. You live in Atlanta, we're in Conyers, that truck you were in came from south Georgia. So, he can kinda cover all that territory, do it better than we can do it. We appreciate you coming in to talk to us today. I know that getting you out of the normal environment—might be a little bit of a break.
>
> MCDANIEL: I really don't feel like talking to them.
>
> CAPTAIN VAUGHN: Well.
>
> AGENT CHEEKS: Well, let me say this. You may not want to talk, but you may want to hear—
>
> MCDANIEL: I don't want to hear, talk with you. If anything happened, I get charged with murder or whatever. I'm going through a lot right now. I really

don't need—y'all gonna do what y'all gonna do.

CAPTAIN VAUGHN: What you going through?

MCDANIEL: It's just, my problems with me and my folks and stuff. You feel me. I don't even want to talk about it now. Here and now talk about it now. I want [indecipherable] I want a lawyer with me or something. I need to call my folks and get my lawyer to come with me and then, you know what I'm saying, we'll talk.

AGENT CHEEKS: Okay.

MCDANIEL: Whatever, whatever, whatever happened, however it happened, I ain't got no choice but to go down because, you know what I'm saying? Whatever, whatever everybody's telling y'all, like y'all told me last time, I ain't got no choice but to go down, stuff like that, that's how it's gonna be.

AGENT CHEEKS: Well, here's the thing. Nobody's told me anything. That's why I'm sitting here talking to you—

MCDANIEL: I'm talking about him, I'm talking about him.

AGENT CHEEKS: Okay, but I'm not talking about him, I'm talking about you. Okay, like he said, they got me involved because of where the truck was from, it being up here, and wherever else in between. Okay, so that's why I'm here, alright? So, you, whatever, you may be under whatever impression, you

know all I have is what I've been provided, which is why they brought you over. So we can, for the most part, at least I thought, kinda sorta iron this out, or at least so I can get a better understanding as to where the truck came from. How did, you know, it come into your possession or whatever.

MCDANIEL: Mmhmm.

AGENT CHEEKS: So, but I understand you have some reservations or whatever, I'm obviously not going to force you to talk to me. You have every right not to, but I would probably say that you should probably reconsider.

MCDANIEL: [indecipherable]

AGENT CHEEKS: But again, that's your decision. So, if you're telling me right now that you have nothing to say and you want to talk to an attorney, is that what you're saying? Okay.

MCDANIEL: I really don't want to talk to no attorney, man, whatever happened, happened, man.

AGENT CHEEKS: That doesn't make sense though—

CAPTAIN VAUGHN: Let me ask you this—

MCDANIEL: I got a lot going on, I don't really know what's going on and stuff, you know what I'm saying?

CAPTAIN VAUGHN: If you don't want to talk to an attorney, and you've said everything to me you want to say, would you be more comfortable just talking to him?

MCDANIEL: Man, it don't matter who, it don't matter, I don't want to talk. Y'all didn't have no recorder in that last room?

CAPTAIN VAUGHN: No, I didn't bring a recorder in with me—

AGENT CHEEKS: Which is why, that's why I'm here.

MCDANIEL: Alright. I'm really tired of talking about it over and over, like. It's crazy man, crazy. I don't really know what to say because y'all ain't gonna believe me, no way.

AGENT CHEEKS: Why don't you try? Why don't you try me and see who I believe—

MCDANIEL: Read me my rights, man, I'm gonna talk to you.

AGENT CHEEKS: You're sure?

MCDANIEL: I'm gonna talk to you. [indecipherable]

Agent Cheeks then verbally provided McDaniel with *Miranda* warnings and asked him whether he "want[ed] to talk to [him] about this truck that [he] w[as] in?" to which McDaniel responded, "What if I tell y'all I wasn't in no truck?"

During the hearing, Agent Cheeks testified that, at the time of McDaniel's March 10 interview, he was in custody and under arrest on charges unrelated to Entrekin's murder. Agent Cheeks testified that he walked in and introduced himself, that McDaniel "started out by saying he didn't want to talk" but then became "agitated" and stated, "just send me up the road if I got to go down." Agent Cheeks testified that he attempted to "get clarification" from McDaniel that "he did, in fact want an attorney" but that McDaniel clarified that he wanted to speak.[3] After McDaniel clarified that he wanted to talk, Agent Cheeks verbally provided *Miranda* warnings to McDaniel and testified that McDaniel nodded to indicate his understanding of each warning.[4] Agent Cheeks testified that McDaniel then agreed to talk and explained how he had stolen Entrekin's pickup truck. Captain Vaughn testified that McDaniel was provided with *Miranda* warnings at each of his three interviews, and that Agent Cheeks conducted the March 10 interview because it was "clear [McDaniel] did not want to talk to me."

The trial court denied McDaniel's motion to suppress on May 13, 2022. In its order, the trial court found that McDaniel's March 10, 2016, custodial interview was the only interview "implicated by the motion." The trial court further found that although McDaniel "initially stated that he did not want to talk and wanted his attorney to come with him, he then reinitiated the conversation with police by continuing to talk about the case, ultimately confirming that he did want to talk and did not need his attorney." As a result, the trial court found that McDaniel failed

---

[3] McDaniel's trial counsel conceded at the motion to suppress hearing that McDaniel's request for a lawyer during the interview was "not clear."

[4] The trial court made no specific finding on this point and it is not clear from our review of the video recording whether McDaniel nodded.

to unequivocally invoke his right to counsel. The trial court also found that McDaniel's counsel acknowledged the lack of clarity in McDaniel's reference to counsel and that McDaniel knowingly and intelligently waived his *Miranda* rights. The trial court further found that McDaniel's "continuing to speak and give information regarding Entrekin's death" operated as a waiver of his rights against self-incrimination because "[h]e could have stopped talking and re-invoked his rights at any time."

"A person in the custody of law enforcement officers has a constitutional right to remain silent in response to their questions, regardless of whether he fully understands that right or has been advised of it under *Miranda*." *Davidson v. State*, 304 Ga. 460, 468 (2018). "The law is clear that, when a person in the custody of law enforcement officers unambiguously and unequivocally invokes his right to remain silent in connection with their interrogation, the interrogation must cease immediately." Id. at 468–69. "[I]nterrogation is defined as express questioning by law enforcement officers' or its functional equivalent—any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *State v. Pauldo*, 309 Ga. 130, 134 (2020) (cleaned up). "Whether an invocation is unambiguous and unequivocal depends on whether the accused articulated a desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Davidson*, 304 Ga. at 469 (citation and punctuation omitted). "Such clarity is absent when a suspect makes an ambiguous statement in the midst of his plain acquiescence to continued questioning." *Goodman v. State*, 313 Ga. 762, 769 (2022). Thus, "if a suspect makes an ambiguous or equivocal reference to the right to remain silent, the police do not have a

duty to clarify the suspect's intent, and the interrogation may continue." *State v. Moon*, 285 Ga. 55, 56 (2009).

Here, McDaniel had the opportunity to invoke his right to remain silent prior to being reminded of his *Miranda* rights. Thus, the question in this case is whether McDaniel clearly asserted his desire to remain silent and, if so, whether officers honored that assertion. See *Davidson*, 304 Ga. at 469. In the first few minutes of the March 10 interview, McDaniel made several statements, considered only in isolation, that would indicate his unwillingness to talk. Yet, he continued to talk. The first statement, "I really don't feel like talking to them" was immediately followed by Agent Cheeks' statement "You may not want to talk, but you may want to hear—." This statement was cut off midsentence by McDaniel's further statements, "I don't want to hear, talk with you. If anything happened, I get charged with murder or whatever. I'm going through a lot right now. I really don't need—y'all gonna do what y'all gonna do." "Although the first half of the statement … might appear unequivocal in isolation," see *Young v. State*, 309 Ga. 529, 536 (2020), it was immediately followed by McDaniel's continuing to talk about how he was "going through a lot right now," rendering his statements ambiguous and equivocal. See id. (although defendant told investigators, "I'm done talking to you," his comments following that statement "render[ed] the whole statement equivocal"). Accordingly, the record supported the trial court's finding that McDaniel waived his right to remain silent. See *Goodman*, 313 Ga. at 769 (defendant's statements that "[he] d[id not] want to talk" to police were not unambiguous assertions of right to remain silent because context showed that, despite his statements, the defendant "continued talking without prompting" from the police); *Turner v. State*, 287 Ga. 793, 795 (2010) (affirming trial court's conclusion that appellant's custodial statements were admissible because appellant's

12

statement, "'if y'all are going to try to do me like that, I don't want to talk no more,' was only an equivocal invocation of his right to remain silent, and thus the interrogating officers had no obligation to stop questioning him"). This claim therefore fails.

To the extent McDaniel argues that investigators also violated his right to counsel, that claim also fails. "[A] suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation." *Pauldo*, 309 Ga. at 133 (citation and punctuation omitted). "If the police continue to interview a suspect who has made a clear and unequivocal request for counsel, any resulting statements made by the suspect are inadmissible in the State's case-in-chief." *Burns v. State*, 323 Ga. 402, 410 (2026) (citation and punctuation omitted). "However, a suspect's request for a lawyer must be clear and unambiguous such that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. at 411 (cleaned up). In other words, "If the defendant makes reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, cessation of the questioning is not required." Id. (citation and punctuation omitted).

Here, after McDaniel stated that he "want[ed] a lawyer with [him] or something," he immediately continued to speak with investigators, stating "whatever happened, however it happened, I ain't got no choice but to go down because … whatever everybody's telling y'all, like y'all told me last time, I ain't got no choice but to go down, stuff like that, that's how it's gonna be." And when asked by Agent Cheeks whether he "want[ed] to talk to an attorney," McDaniel confirmed that he did not "want to talk to [an]

13

attorney." Accordingly, there was no unequivocal invocation of his right to counsel and this claim fails. See *Burns*, 323 Ga. at 412 (defendant's statement "I'll just wait on a lawyer or something or whatever" was not an unequivocal request for an attorney, "especially where Burns did not stop talking").

3. McDaniel argues that the trial court erred in denying his objection to the State's playing of only portions of his March 10, 2016, custodial interview on the ground that it violated the rule of completeness. This claim fails.

At trial, the recording of McDaniel's March 10, 2016, interview was admitted as State's Exhibit 85. When the State requested to publish State's Exhibit 85, the trial court asked whether it was "going to publish a three-hour videotape?" The State responded that it would be playing "from about the 35-minute mark of video 2 of [McDaniel's] statement since it's a three-hour interview." McDaniel's counsel then objected, arguing that "based on the rule of completion … the State should submit the entire DVD." During a bench conference outside the presence of the jury, the trial court stated the following:

> TRIAL COURT: So I don't think they're required to play three hours. The rule of inclusion, it's been admitted. To the extent they want to play portions of it, I believe they're entitled to. If y'all want to do a brief, I can get a legal brief.
>
> TRIAL COUNSEL: That's fine. I mean, I can play it in my case.
>
> TRIAL COURT: Okay. If you'd like. All right.

The video portions identified by the State were then played for the jury.

14

Later that day, outside the presence of the jury, the trial court noted that "both of you, either one of you can play all three" parts of McDaniel's March 10 interview and asked whether the State intended to play any more of the interview on the second day of trial. The State responded that it intended to play "approximately 25 minutes" of the interview, and the trial court reiterated that "the court agree[d] to the extent the defense wishes to present the full three-hour tape, the defense to the extent they put on a case in chief is entitled to do so for the record." McDaniel did not play the full interview during his case in chief.

OCGA § 24-1-106 provides that

When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which, in fairness, should be considered contemporaneously with the writing or recorded statement.

Similarly, OCGA § 24-8-822 provides that "[w]hen an admission is given in evidence by one party, it shall be the right of the other party to have the whole admission and all the conversation connected therewith admitted into evidence." "The rule of completeness prevents parties from misleading the jury by presenting portions of statements out of context, but it does not make admissible parts of a statement that are irrelevant to the parts of the statement introduced into evidence by the opposing party." *Thompson v. State*, 304 Ga. 146, 152 (2018) (cleaned up).

Here, the trial court did not make a definitive ruling on McDaniel's objection, stating that "If y'all want to do a brief, I can get a legal brief," to which McDaniel's trial counsel responded,

"That's fine. I mean, I can play it in my case," and then did not play the remainder of the interview. Accordingly, we review this claim for plain error. See *Wilson v. State*, 301 Ga. 83, 87 (2017) (applying plain error review where "record makes plain that the trial court did not make a 'definitive ruling' on the admissibility" of evidence "as contemplated in OCGA § 24-1-103(a)"). To establish plain error, McDaniel "must point to an error that was not affirmatively waived, and that error must have been clear and not open to reasonable dispute, must have affected [his] substantial rights, and must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *Middlebrooks v. State*, 315 Ga. 671, 687 (2023) (cleaned up).

McDaniel has failed to carry his burden of showing plain error because he does not explain how the trial court clearly erred. Although McDaniel argues that the trial court violated the rule of completeness and that "there were minutes that the Defendant was questioned before he was 'Mirandized,'" McDaniel has not cited to any on-point controlling authority holding that the trial court was required to order the State to play the entire interview. In addition, McDaniel does not explain how what was said in the portions of the interview that were not played would have made any difference in the outcome of the case. McDaniel does not even argue that he was harmed by the trial court's alleged error. Accordingly, this enumeration fails. See *Thompson*, 304 Ga. at 152 (appellant failed to carry his burden of showing plain error where he did "not identif[y] any … specific statements in the portions of the recording that the State played for the jury which needed to be explained by playing the rest" of the witness's interview).

*Judgment affirmed. All the Justices concur.*

16